MATTHEW SCHINDLER, OSB# 964190
501 Fourth Street #324
Lake Oswego, OR 97034
Phone: (503) 699-7333
FAX: (503) 345-9372
e-mail: mas@schindlerdefends.com

ATTORNEY FOR DEFENDANT KNEKO TYRAY MOORE

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | Case No. 3:20-cr-00474-IM |
| | **MOTION TO SUPPRESS EVIDENCE** |
| vs. | **EVIDENTIARY HEARING AND ORAL ARGUMENT REQUESTED** |
| KNEKO TYRAY MOORE,<br>Defendant(s). | |

# Table of Contents

1. Introduction – A White Man's Lie: ........................................................ 3

   A. The City of Portland, through its Police Bureau, has a history of institutionalized racism involving systematically targeting Blacks like Mr. Moore, and then relying on its lack of transparency to avoid accountability in Court. ............................................................................................... 4

   B. The PPB has a continuing practice of racist policing targeting Black men like Mr. Moore. ................................................................................. 13

   C. The PPB's intentional lack of transparency cuts against the credibility of the PPB officers' testimony. ............................................................... 19

2. Statement of Facts: ................................................................................. 30

A.   A white man lied to the PPB and the officers knowingly connected that lie to Mr. Moore. ........................................................................................ 30

B.   The "traffic" stop is tainted by the officers' intentional reliance on false information. ......................................................................................... 35

3.   Legal Arguments: ...................................................................................... 43

A.   Mr. Moore has a reasonable expectation of privacy in the rental car he was driving on April 17, 2020. .................................................................... 43

B.   The officers repeatedly violated PPB Policy directives in their encounter with Mr. Moore. .......................................................................... 44

   i.    Officers violated PPB Policy Directive 0900.00 concerning written reports .......................................................................................................... 45

   ii.   The officers violated PPB Policy Directive 0630.60 when impounding Mr. Moore's car. ................................................................... 49

   iii.  This was not a lawful inventory search consistent with PPB policy…..................................................................................................... 51

C.   PPB did not have probable cause to stop Mr. Moore ......................... 57

D.   The PPB GVRT officers unjustifiably prolonged the stop to investigate matters unrelated to the alleged traffic infractions. ................................... 60

E.   The officers did not have probable cause to believe there was a firearm in the car. .................................................................................................... 64

F.   Officers unlawfully collected Mr. Moore's DNA .............................. 65

4.   Conclusion: ............................................................................................... 67

Defendant, Kneko Moore, through counsel, Matthew Schindler, moves the Court to suppress all evidence seized after Portland Police Bureau ("PPB") Gun Violence Reduction Team ("GVRT") officers unlawfully extended a traffic stop and searched Mr. Moore's rental car on the night of April 17, 2020 in violation of the 4th Amendment. Mr. Moore requests an evidentiary hearing and oral argument.

1. **Introduction – A White Man's Lie:**

Mr. Moore is Black man subjected to a traffic stop by the PPB GVRT. Before the Court is presented any evidence, before it hears any testimony or argument, it must be clear that this fact is central to this hearing. Even knowing nothing about the specifics of the case, the PPB GVRT's documented history of racist traffic stops targeting Blacks, and its lack of transparency, as demonstrated by failing to adequately document its stop of Mr. Moore, raise serious constitutional questions about the officers' conduct on the night of April 17, 2020 while they allegedly "investigated" a traffic violation.

Mr. Moore recognizes that the federal courts have taken the view that law enforcement motives, even if obviously racist, do not make their actions

unlawful under the 4th Amendment.[1] Mr. Moore submits, however, that the

continuing unlawful and unconstitutional practice of PPB targeting Blacks is

bias and interest relevant to the credibility of any PPB officer that testifies

during this motion hearing or at trial.[2] The PPB's empirically established

institutionalized racism, as outlined below, diminishes the credibility of any

testimony these officers will provide to the court.

A. <u>The City of Portland, through its Police Bureau, has a history of institutionalized racism involving systematically targeting Blacks like Mr. Moore, and then relying on its lack of transparency to avoid accountability in Court.</u>

To this day, the Portland Police Bureau is tainted by institutional racism

that goes back to the beginnings of the State, and the City's founding:

> "When Oregon was admitted to the United States in 1859, it was the only state whose state constitution explicitly forbade black people from living, working or owning property within its borders. Until 1926, it was illegal for black people to even move into the state. Its lack of diversity fed a vicious cycle: whites looking to escape the South after the end of the Civil War flocked to Oregon, which billed itself as a sort of pristine utopia, where land was plentiful and diversity was scarce. In the early 1900s,

---

[1] *See Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996).

[2] *See e.g. United States v. Abel*, 469 U.S. 45, 45, 105 S. Ct. 465, 465, 83 L. Ed. 2d 450 (1984); *United States v. Pemberton*, 435 F. Supp. 3d 250, 257 (D. Me. 2020); "The relevance of the subject of racial bias is readily apparent, for several reasons. First, proving the officers' actions were racially motivated could explain why they stopped the boys' vehicle without probable cause or reasonable suspicion…" *Price v. Kramer*, 200 F.3d 1237, 1251 (9th Cir. 2000).

Oregon was a hotbed of Ku Klux Klan activity, boasting over 14,000 members (9,000 of whom lived in Portland). The Klan's influence could be felt everywhere, from business to politics—the Klan was even successful in ousting a sitting governor in favor of a governor more of its choosing. It was commonplace for high-ranking members of local and statewide politics to meet with Klan members, who would advise them in matters of public policy.

In this whitewashed world, Portland—Oregon's largest city then and now—was known as one of the most segregated cities north of the Mason-Dixon line: the law barring blacks from voting in the state wasn't revoked until 1927.[3]

This appalling history of civic institutionalized racism was manifest in the comfortable relationship between the Ku Klux Klan and the highest levels of Portland's law enforcement apparatus, here posing together for a photo:

---

[3] *See* Smithsonian Magazine, "How Oregon's Second Largest City Vanished in a Day" accessed on May 11, 2021 at:  https://www.smithsonianmag.com/history/vanport-oregon-how-countrys-largest-housing-project-vanished-day-180954040/?no-ist



CHIEF KLUXERS TELL LAW ENFORCEMENT OFFICERS JUST WHAT
MYSTIC ORGANIZATION PROPOSES TO DO IN CITY OF PORTLAND

MORAL and political clean-up will be the object of Ku Klux Klan's first campaign, the King Kleagle, ranking officer for Oregon, told a group of citizens at a meeting yesterday in which his guests were summoned by mysterious telephone messages. The King Kleagle is the sheeted figure in

The photo titled "CHIEF KLUXERS TELL LAW ENFORCEMENT OFFICERS JUST WHAT MYSTIC ORGANIZATION PLANS TO DO IN PORTLAND" was published in the Portland Telegraph in 1921. The King Kleagle of the Klan called the meeting documented in the photograph to announce to law enforcement and the community that bigotry would require vigilante justice: "There are some cases, of course, in which we will have to take everything in our hands. Some crimes are not punishable under existing laws, but the criminals should be punished."[4] What they proposed to do was

---

[4] Image and quote taken from Portland Telegraph August 2, 1921 archived at the Oregon Historical Society and accessed May 11, 2021 at

terrorize Blacks, Catholics, Jews, and others. Unbelievably, the law enforcement leadership  in the room approving the white supremacist terrorist's message included the Captain of the PPB, the Chief of the PPB, the Multnomah County District Attorney, the U.S. Attorney for the District of Oregon, an agent for the U.S. Department of Justice, and the Mayor of Portland.[5] It is hard to imagine a more compelling document of Portland law enforcement's history of institutionalized racism then this photo.

The paradox between the current popular image of Portland as a progressive, liberal city of tolerance and the PPB's violence and racism could not be more striking, and it too has its roots in our history.[6] The conflict between progressive communities and reactionary racist police is rooted in America's darkest history, and deeply entrenched.[7] Municipal policing in America arose in the service of slave owners, catching runaways, and after the Civil War, the same police brutally enforced segregation under Jim Crow.[8] Modern policing has evolved on an ad hoc basis, often following political

---

https://www.oregonhistoryproject.org/articles/historical-records/kkk-meets-with-portland-leaders-1921/#.YJsW6rVKjyt
[5]*Id.*
[6] "RS Reports: Progressive City, Brutal Police -The paradox of Portland, Oregon, shows why the fight to change police culture takes more than liberal values and good intentions" by Tim Dickinson, Rolling Stone dated July 20, 2020 accessed May 28, 2021 at: https://www.rollingstone.com/politics/politics-features/portand-oregon-police-brutality-history-1027677/
[7] *Id.*
[8] *Id.*

intuition and gut theories about deterring crime rather than empirical or scientific processes.[9]

If racism in Portland law enforcement had ended when the overt relationships between Portland law enforcement and white terrorists like the Klan waned in the later 1930's, Mr. Moore would not be raising it now. Racism in Portland law enforcement did not end then, however. The overt racism evolved over time into institutionalized racism entrenched in the PPB's culture, policies, and leadership. Overwhelming objective evidence shows it continues to this day.[10]

In the 1960's 45% of the people arrested in Portland were Black despite being 5% of the population. [11] In the 1970s, 60% of the people killed by the police in Portland were Black despite being 5% of the population.[12]

On March 14, 1975, white Portland police officer Kenneth Sanford shot Black seventeen-year-old Rickie Charles Johnson in the back of the head and

---

[9] *Id.*

[10]*See "A Racist History Shows Why Oregon Is Still So White"* by Tiffany Camhi, OPB June 20, 2020 accessed at May 11, 2021 at: https://www.opb.org/news/article/oregon-white-history-racist-foundations-black-exclusion-laws/

[11] *See Law Enforcement & The Civil Rights Movement* accessed on May 11, 2021 at: https://blogs.oregonstate.edu/oregonsocialjustice/black-blue-african-americans-law-enforcement-u-s-history-public-history-project/law-enforcement-the-civil-rights-movement/

[12] *Id.*

killed him during a sting operation.[13] Johnson was the fourth person of color to be shot and killed by Portland police within a five-month period.[14] Portland's nearly all white government believed that a public inquest might quell unrest in the Black community.[15] Mayor Neil Goldschmidt and District Attorney Harl Haas agreed to the inquest which featured an Assistant District Attorney questioning Officer Sanford.[16] Despite the city's advocacy, Officer Sanford was declared innocent by the jury in a 4-1 vote.[17] The lone vote for conviction came from the only Black man on the jury.[18]

In 1981, amid national unrest relating to the Atlanta murders of 1979–1981, two Portland police officers placed dead opossums outside the Burger Barn, a Black-owned restaurant, while the owner's Black son watched.[19] Officers had run over the animals earlier, tossed them in their cruisers, and then radioed in backup to laugh, as they deposited them at the Burger Barn.[20]

---

[13] *See "'On the Murder of Rickey Johnson y Johnson':* the Portland Police Bureau, Deadly Force, and the Struggle for Civil Rights in Oregon, 1940 – 1975" by Katherine Elleen Nelson, June 12, 2018 at i. Accessed on May 11, 2021 at: https://pdxscholar.library.pdx.edu/cgi/viewcontent.cgi?article=5505&context=open_access_etds

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id* at i-ii.

[18] *Id* at ii.

[19] *See The Possums, the Police, and the Burger Barn* by Marty Patail October 2020 Portland Monthly accessed on May 11, 2021 at: https://www.pdxmonthly.com/news-and-city-life/2020/09/the-possums-the-police-and-the-burger-barn

[20] *Id.*

The Black police commissioner, Charles Jordan, fired them and the response from the police union was overwhelming.[21] Jordan had to have bodyguards and was receiving death threats.[22] The fired officers were ultimately reinstated by an arbitrator.[23]

In April 1985, Black off-duty security guard and former Marine Lloyd "Tony" Stevenson was at a 7-Eleven on NE Weidler Street when it was robbed.[24] He helped stop the thief, then got into an argument with a witness in the parking lot.[25] Police arrived and white Officer Gary Barbour killed the 31-year-old Stevenson with a carotid artery "sleeper" hold, a tactic since banned.[26] The PPB union responded by distributing T-shirts to officers that said "Smoke 'Em, Don't Choke 'Em," with the image of a gun.[27]

In 1996, 20-year-old Black man Deontae Keller was shot in the back and killed by white PPB officers while running from a traffic stop.[28] On May

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *See A brief history of African-Americans killed by PPB 'When is this going to stop? That's the bottom line'* by Ken Boddie, KOIN 6 News, June 4, 2020 accessed at

[25] *Id.*

[26] *Id.*

[27] *See "How Portland's Racist History Informs Today's Protests"* by Ari Shapiro NPR July 30, 2020 accessed on May 11, 2021 at: https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/07/30/897298379/how-portlands-racist-history-informs-today-s-protests

[28] *See "A brief history of African-Americans killed by PPB 'When is this going to stop? That's the bottom line'"* by Ken Boddie, KOIN 6 News, June 4, 2020 accessed on May 13, 2021 at: https://www.koin.com/news/special-reports/a-brief-history-of-african-americans-killed-by-ppb/

5, 2003, 21-year-old Black woman Kendra James tried to drive away from a traffic stop in North Portland.[29] White Officer Scott McAllister shot her dead.[30] He said he feared James would run him over, even though the officer was leaning into the car's driver's side window.[31]

In 2002, voters in Oregon passed a ballot initiative to strike offensive racist terms from the Oregon Constitution.[32] Although it was approved, more than 350,000 Oregonians, amounting 30% of all the people who voted, wanted keep overtly racist terms in the state constitution.[33]

On March 28, 2004, just 9 months after Kendra James was killed by police, Black man James "Jahar" Perez was shot to death by Portland police during a traffic stop.[34] A public inquest exonerated the white officer who said he feared a weapon.[35] Perez was unarmed, with his seatbelt still fastened when he was killed by PPB.[36]

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *See* Measure 14 to Remove Constitutional References to Race (2002) BallotPedia accessed May 11, 2021 at:
https://ballotpedia.org/Oregon_Remove_Constitutional_References_to_Race,_Measure_14_(2002)

[33] *Id. See also "The Racist History of Portland, the Whitest City in America"* by Alena Semeuels May 8, 2020 accessed on May 11, 2021 at:
https://web.archive.org/web/20200508193733/https://www.theatlantic.com/business/archive/2016/07/racist-history-portland/492035/

[34] *Id.*

[35] *Id.*

[36] *Id.*

In January 2010, Black man Aaron Campbell was having a mental health crisis and the police were called.[37] Campbell was shot in the back and killed by a white PPB officer.[38] The officer was fired and then later reinstated.[39]

On September 12, 2012, the United States Department of Justice – Civil Rights Division opened an investigation into the Portland Police Bureau's excessive use of force against the mentally ill.[40] In the letter, the USDOJ also expressed concerns about PPB and its relationship with the Black community:

> "[I]t is important to discuss the most prevalent concern identified in the course of our investigation – the often tense relationship between PPB and the African American community. Data provided to us by a local watch group indicated that PPB disproportionately stops African Americans. The data indicate that 12-24% of PPB's traffic and pedestrian stops are of African Americans. However, only 6.4% of the City's overall percentage is African American. While it appears PPB has policies prohibiting discrimination (§344.00) and bias based policing (§344.05), a policy on how and when an officer initiates contacts with citizens is missing."[41]

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] See Letter from USDOJ Civil Rights Assistant Attorney General Thomas Perez to Mayor Sam Adams dated September 12, 2012 accessed on May 11, 2021 at: https://www.justice.gov/iso/opa/resources/9362012917111254750409.pdf

[41] *Id* at 38-39.

The PPB's lack of transparency leaves serious questions about racial profiling and targeting of Blacks in direct violation of Bureau policy and Equal Protection.[42] Despite federal scrutiny, nothing changes, Blacks continue to be targets.

Black man Quanice Hayes was 17 when he was killed February 9, 2017, by Portland police Officer Andrew Hearst, who shot Hayes three times with an AR-15 rifle from 10 feet away as Hayes was on his knees with hands in the air.[43] Police had cornered Hayes in a rain-soaked driveway in Northeast Portland following reports of armed car jackings in the area.[44] Hayes was not armed when Hearst killed him.[45] A month later, a grand jury declined to charge Hearst for the shooting.[46]

The PPB has a long and troubled history of systemic and institutional racism targeting Blacks in Portland that must be taken into account in assessing the officer's conduct during this traffic stop of a Black man.

B.  <u>The PPB has a continuing practice of racist policing targeting Black men like Mr. Moore.</u>

---

[42] *Id* at 38.

[43] *See* "*Portland to settle Quanice Hayes police shooting lawsuit for more than $2 million*" by Conrad Wilson, OPB dated February 24, 2021 accessed on May 12, 2021 at: https://www.opb.org/article/2021/02/23/police-shooting-quanice-hayes-settlement/

[44] *Id.*

[45] *Id.*

[46] *Id.*

The reason a disproportionate number of Blacks have been killed by the PPB is because Blacks like Mr. Moore are specifically targeted by the PPB in pretext stops and racial bias leads to the unnecessary use of force.[47] The statistics starkly bear this out. Data compiled by the website FiveThirtyEight looked at the 37 largest jurisdictions in the country and found that the PPB kill Black people 3.9 times more often than white people.[48] The fifth worst in the country.[49]

PPB creates racist units like the Gang Enforcement Patrol and the Gun Violence Reduction Team that are expensive, do nothing to reduce crime, and consistently involve targeting Blacks.[50] The same data from FiveThirtyEight shows that Portland police arrest Black people at a per capita rate 4.3 times higher than white people, also the fifth worst in the country.[51]

---

[47] *See "Portland has 5th worst arrest disparities in the nation, according to compiled data"* by Jonathan Levinson OPB February 7, 2021 accessed on May 12, 2021 at: https://www.opb.org/article/2021/02/07/portland-has-5th-worst-arrest-disparities-in-the-nation-according-to-data

[48] *Id.*

[49] *Id.*

[50] *See* "GANG ENFORCEMENT PATROL: The Police Bureau must show that traffic stops are effective" by Portland City Auditor released March 2018 at 4. (The Gang Enforcement Team costs between $6 and $7 million per year.) The title of the report shows that there is no proof that the Gang Enforcement Team accomplished anything. Accessed on May 13, 2021 at: https://www.portlandoregon.gov/auditservices/article/677598

[51] *Id.*

The reason such a disproportionate number of Black people are arrested and killed by PPB over such a long period of time is most readily explained by the fact that the PPB is an institution established on racism, its policies are racist, and it targets Blacks without repercussion. If there is another explanation, Mr. Moore is keen to hear it.

In a far-ranging report from 2018, the Portland City Auditor found that the PPB Gang Enforcement uses "traffic violations as a pretext to create opportunities to search for illegal guns or to arrest people for other crimes. Pretext reasons include minor violations, such as changing lanes without a signal or infringing on a crosswalk."[52] Exactly this kind of pretext stop occurred here.

In the 2018 report, the City Auditor also found that Blacks were targeted and disproportionately impacted by the Team:

> "Our analysis of demographic data collected by the team shows that its stops largely affected African Americans. Of the 1,300 encounters recorded by the team in 2016, the Police Bureau has demographic data for about 800 traffic stops. Fifty-nine percent of these traffic stops were of an African American person. White people made up 24 percent of the team's stops."[53]

---

[52] *Id* at 2.
[53] *Id* at 6.

In those 800 cases the City auditor considered, 59% of those stopped were Black and they represent just 6% of the Portland population. There is simply no argument that PPB is not targeting people like Mr. Moore based on race. This disparity cannot be coincidence and it is not because Blacks commit more crimes.[54] These deviations from per capita representation are too great.

It is not just the Gang Enforcement Team, the similarly racist special unit called the Gun Violence Reduction Team reported in 2019 that 52% of all the people it stopped were Black despite Blacks being only 6% of the population.[55] In comparison, whites, who represented 79% of the population, were stopped just 24% of the time.[56]

Blacks were significantly more likely to be asked to be searched when stopped by the team's officers (search asked for in 36% of stops), and white people were significantly less likely to be asked to be searched when stopped (search sought in 13.7% of their stops), the bureau's report said.[57] This grossly disproportionate targeting of blacks is even more unfair considering that of

---

[54] *See* "In 2019, the Portland police Gun Violence team made 1,600 stops. More than half were Black people." Maxine Bernstein, Oregonian, dated November 19, 2020 accessed on May 13, 2021 at: https://www.oregonlive.com/crime/2020/11/in-2019-the-portland-police-gun-violence-team-made-1600-stops-more-than-half-were-black-people.html
[55] *Id.*
[56] *Id.*
[57] *See* "*In 2019, the Portland police Gun Violence team made 1,600 stops. More than half were Black people.*" Maxine Bernstein, Oregonian, dated November 19, 2020 comments of PPB Chief Lovelle.

the team's consent searches, Black people were found with contraband in 46% of the searches, less frequently than when white people were searched with their consent, at 56.4% of the searches involving whites revealed contraband.[58]

The statistics further reveal that Blacks have a quantitatively and qualitatively different law enforcement experience in Portland than whites. The PPB helps white people and it stops, searches, and arrests Black people. The chart below from the City Auditor's Report encapsulates the difference:[59]



76% of all contacts between whites and the gang team were traffic injuries.[60] In other words, incidents where the police were helping white

---

[58] *Id.*

[59] *See* "*GANG ENFORCEMENT PATROL: The Police Bureau must show that traffic stops are effective*" by Portland City Auditor released March 2018 at 7. Accessed on May 13, 2021 at: https://www.portlandoregon.gov/auditservices/article/677598

[60] *Id.*

people. Meanwhile only 9% of the contacts between Blacks and the team were traffic injury related.[61] These officers were 7.5 times more likely to be helping a white person than a Black person. The PPB frequently argues that it contacts more Black people because more Black people are victims of gun violence.[62] That is simply not true. Only 18% of the police contacts involve a Black person as the victim of a crime.[63] These statistics prove that whites and Blacks in Portland experience different treatment from the PPB.

While this racist unit were harassing Black people, it also spectacularly failed to fulfill its mission. In 2021, Portland gun violence has reached an historic high.[64] Members of this team were involved in stopping and searching Mr. Moore on April 17, 2020. These numbers are perfectly consistent with the entire racist history of the PPB.

Finally, on June 23, 2021 the Mayor and Chief of Police announced that because of the obvious, objective evidence of racial disparities and racist

---

[61] *Id.*

[62] *See* "*In 2019, the Portland police Gun Violence team made 1,600 stops. More than half were Black people.*" Maxine Bernstein, Oregonian, dated November 19, 2020 comments of PPB Chief Lovelle accessed on May 28, 2021 at:
https://www.oregonlive.com/crime/2020/11/in-2019-the-portland-police-gun-violence-team-made-1600-stops-more-than-half-were-black-people.html

[63] *Id.*

[64] *See* "A look at the numbers: How Portland's gun violence deaths compare to other cities" Sarah Hurwitz, KOIN News, dated June 8, 2021 accessed June 10, 2021 at:
https://www.kptv.com/news/a-look-at-the-numbers-how-portlands-gun-violence-deaths-compare-to-other-cities/article_3cda7278-c8b1-11eb-995d-cf24acda0b68.html

policing targeting Blacks, the Portland Police Bureau will no longer be initiating traffic stops for minor violations.[65] It is an extraordinary admission that PPB's racist stops targeting Blacks are an example of institutionalized racism.[66] The Mayor said: "The goal is to make our city both safer and more equitable, helping reduce the number of Black, Indigenous, and People of Color who are disproportionately impacted by consent searches and traffic stops," Mayor Ted Wheeler said.[67]

Before the Court considers anything else about this stop, it must be aware that institutional racism and racial bias colored the officers' conduct during this "traffic" stop and will undoubtedly influence the testimony they provide to this Court. This is archetypical witness bias that must be assessed and weighed by a fact finder.

C. The PPB's intentional lack of transparency cuts against the credibility of the PPB officers' testimony.

The PPB's institutional racism is partnered with the relentless avoidance of transparency and accountability. When PPB killed possums and put them in front of a popular Black restaurant. What happened? No one was

---

[65] *See* "Mayor and Police Chief Announce PPB Will Change Traffic Enforcement, Consent Search Protocols" accessing on June 25, 2021 at: Mayor and Police Chief Announce PPB Will Change Traffic Enforcement, Consent Search Protocols | Portland.gov
[66] *Id.*
[67] *Id.*

fired. When choke holds were banned, and officers wore shirts that said: "Smoke 'em. Don't Choke 'em." What happened? No one lost their job. Irrefutable statistical evidence shows that the PPB pursues racially targeted stops over decades and what happens? Nothing.

To avoid accountability for decades requires opacity. Portland has supposedly maintained data on police stops since 2001 but it does not appear that anything has ever been done in response to consistent data points showing systematic targeting of Blacks.

For decades, the PPB has repeatedly been told that it needs better reporting of the use of force and stops.[68] The federal government intervened in 2006 and again in 2012.[69] It notes the city and PPB were given that same advice in 2006 and did nothing.[70] Yet, eight years after the 2012 letter from the USDOJ, the leadership of the PPB is still talking about the need to improve data collection.[71]

---

[68] See Letter from USDOJ Civil Rights Assistant Attorney General Thomas Perez to Mayor Sam Adams dated September 12, 2012 at 25, 38-39 accessed on May 11, 2021 at: https://www.justice.gov/iso/opa/resources/9362012917111254750409.pdf
[69] *Id* at 38.
[70] *Id* at 38.
[71] *See* "*In 2019, the Portland police Gun Violence team made 1,600 stops. More than half were Black people.*" Maxine Bernstein, Oregonian, dated November 19, 2020 comments of PPB Chief Lovelle accessed on May 28, 2021 at: https://www.oregonlive.com/crime/2020/11/in-2019-the-portland-police-gun-violence-team-made-1600-stops-more-than-half-were-black-people.html

We now know it is a fact that the PPB and the GVRT routinely target Blacks.[72] The court should note that it was not the PPB or the City that established in 2021 this fact that Portland was the fifth worst in the country for racial arrest disparities. It was a private data website, FiveThirtyEight, which did it.[73] The fact that this data had to be compiled independently by FiveThirtyEight and was not done by the PPB or the city, demonstrates the lack of accountability and transparency on these issues.[74] PPB's willful ignorance of the racist consequences of its policies targeting Blacks weighs against the credibility PPB GVRT witnesses.

In 2019, we learned that despite having supposedly having a policy requiring officers to track stop data, more than 500 of the PPB Gang Enforcement Team's 1300 total stops resulted in no data.[75] It is likely then that the determination that 59% of all stops targeting Blacks is a serious underrepresentation of the true number if all the data had been captured. The only logical reason in 500 cases no data was collected despite policy is a concerted effort to avoid transparency and accountability.

---

[72] *Id. See also "Portland has 5th worst arrest disparities in the nation, according to compiled data"* by Jonathan Levinson OPB February 7, 2021 accessed on May 12, 2021 at: https://www.opb.org/article/2021/02/07/portland-has-5th-worst-arrest-disparities-in-the-nation-according-to-data
[73] *Id.*
[74] *Id.*
[75] *See* fn. 64.

Back in 2012, one of the key remedial measures the USDOJ recommended was better reporting requirements:

> "Require that PPB officers document each citizen contact, including the reason they stopped the subject, whether the subject consented to the conversation, whether the officer informed the subject that he/she had the right to decline consent, whether the mere conversation escalated further, and demographical information about the subject. Require that supervisors conduct timely reviews of this data."[76]

Almost 10 years later, there is no such requirement, and it is evident from the grossly insufficient documentation of Mr. Moore's stop. In Mr. Moore's case, there were 22 PPB officers including four sergeants who show up on the Bureau of Emergency Communications records as being connected to Mr. Moore's traffic violation.[77] From these 22 officers, the government has provided three official reports from three officers totaling 12 pages. Those 22 officers generated a total of six still images of the vehicle after the stop. There is not a single video or audio recordings of this stop. Not a single witness is interviewed. The key piece of evidence in the case, the gun, was handled and moved and there is nothing documenting by whom.

---

[76] See Letter from USDOJ Civil Rights Assistant Attorney General Thomas Perez to Mayor Sam Adams dated September 12, 2012 at 41, accessed on May 11, 2021 at: https://www.justice.gov/iso/opa/resources/9362012917111254750409.pdf

[77] *See* Schedule of PPB Officers attached as Exhibit 1.

12 pages is somewhat misleading really. The substance of these reports boils down to about four paragraphs, some of which knowingly contain false and misleading statements. Most significantly, not one of those 12 pages provides a clear explanation of why Mr. Moore was arrested or under what authority the car was searched. The defense has no idea what the other 20 officers' involvement was in the stop or what they witnessed because none of them wrote anything down.[78] In 2021, such a lack of documentation cannot be considered mere oversight or exigency, not from this police department. It is an intentional effort to obscure PPB GVRT's targeting of Black men with the post hoc rationalization that a gun was found.

In February 2021, the federal government found that the PPB failed to adequately report actions taken in response to the George Floyd protests in the summer of 2020.[79] In response, the City hired Rosenbaum and Associates to conduct an analysis of the PPB's response.[80] The PPB's internal assessment of the protest response ludicrously concluded that the Bureau did an "excellent

---

[78] Assuming this must be an error, the defense has asked twice for all reports related to this event and the government has represented that there are no more reports.

[79] See "Portland police not meeting federal requirements on use of force, training, Justice Department finds" by Maxine Bernstein, Oregonian, dated February 11, 2021 accessed May 28, 2021 at: https://www.oregonlive.com/crime/2021/02/portland-police-not-meeting-federal-requirements-on-use-of-force-training-justice-department-finds.html

[80] "City-hired consultants blast Portland police analysis of bureau's handling of mass protests as 'tone deaf'" by Maxine Bernstein, Oregonian, dated May 6, 2021 accessed on May 28, 2021 at: City-hired consultants blast Portland police analysis of bureau's handling of mass protests as 'tone deaf' - oregonlive.com

job."[81] In a report dated April 14, 2021, the outside consultants found the PPB's conclusion baseless.[82] The consultants took particular issue with the PPB's failure to adequately document police actions.[83] The consultants found that the PPB could not conclude that an "excellent job" was done when there were no records indicating meaningful review by the Bureau of its officers' actions.[84]

The government provided the PPB audio recordings from the stop as discovery in this case. These reflect the grossly insufficient systems the PPB uses to avoid accountability. For example, the Bureau of Emergency Communications ("BOEC") audio communications provided in discovery are a confusing and incomplete document of events.  Given the state of these recordings and having not litigated a traffic stop involving the PPB in federal court before, defense counsel naively assumed that there must be some error in the BOEC discovery. It should be obvious that it is near worthless to record bits and pieces of police interactions with no or inconsistent time stamps.

---

[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*

Assuming there must be more, the defense made a request for additional discovery including audio and video recordings of the event in question.[85]

The government's response on these issues makes clear that the PPB intentionally maintains its communication systems in a manner that fails to assure any meaningful data is being recorded:

> "The short answer is this – not every police officer communication is recorded by BOEC. To the extent there were recordings in this case, you have those recordings in discovery. The Central Tac 1 and Central Tac 2 (as well as other precincts Tac 1 and Tac 2 channels) are recorded precinct-specific radio channels, and at this time, unencrypted radio channels. They are primarily utilized by the specific precinct patrol division denoted by the title. I.e. Central, North, or East. The PPB gun team formerly known as "GVRT" was assigned to the Tactical Operations Division, not precinct designated, and therefore would not operate on a precinct channel unless/until they responded to a direct precinct action. While conducting directed tactical missions, or responding to specific calls where a specialized team was needed, other tactical radio channels, outside the precinct related channels, are utilized. These other channels do not involve a dispatcher and are not recorded."

> Email from AUSA responding to discovery request dated March 3, 2021

The government's explanation of BOEC is an acknowledgement that these officer's official actions are intentionally obscured because there is no

---

[85] *See* Discovery Request United States v. Moore dated February 12, 2021 attached as Exhibit 2.

requirement that *all or even any* communications be recorded. Because the PPB does not have sufficient communication policies, many key events may not be recorded by BOEC. In this case, the tactical team involved in this stop specifically and intentionally does not use a channel that is recorded so that it can avoid transparency and accountability for their official communications.

Also according to the government, it believes, but cannot be certain, that at least some of the BOEC materials included in Mr. Moore's case relate to another matter that has nothing to do with Mr. Moore.[86] The defense is left wondering if communications relevant to Mr. Moore are on some other defendant's BOEC production. The government has no way of knowing.

According to the government, the Computer Assisted Dispatch ("CAD") records are similarly incomplete and therefore nearly useless:

> In general, Computer Aided Dispatch records are most definitely not an exhaustive accounting of every human and vehicle located at every crime scene or traffic stop. The CAD reflects the entries made by humans in complex situations. I routinely have officers explain CAD printouts in motions hearings, and examples abound about how the CAD is only as good as the data that goes in, which is highly dependent on the circumstances and the officer entering that data. E.g. a CAD could show an officer arriving OS ("on scene") at 5 pm. That same CAD could also show the same officer never cleared or left that scene. Does that

---

[86] "As for the second part of your question, I listened to MOORE_0000134. It does not appear that this is related to 20-125538, Moore's case." Email from AUSA responding to discovery request dated March 3, 2021.

mean the officer never left?  No.  It just means he did not enter the time he cleared.  Per Officer Panter, it is not unusual for the gun task force officer who comes to take swabs of the gun to not formally enter himself "on scene."

Email from AUSA responding to discovery request dated March 3, 2021

In other words, like BOEC recording, the CAD is largely useless at capturing an interaction between PPB and a citizen. From these failures, it is fair to infer that this is another of the PPB's intentional efforts to avoid transparency and accountability. It also taints these officers' credibility.

Besides failing to adequately document most everything and a useless official communication system that does not record much, the PPB routinely and consistently avoids other critical measures that would promote transparency including audio and video recording of all stops, officer body cameras, and vehicle cameras.

In 2014, United States District Court Judge Simon told the PPB they should use body cameras.[87] None were implemented. In January 2021, Chief Judge Hernandez held the PPB in contempt for failing to abide by his prior orders and informed the City that he was considering ordering the PPB to wear

---

[87] "Mayor Charlie Hales pushing for body cameras on uniformed Portland police officers within a year" by Maxine Bernstein, Oregonian, dated September 4, 2014 accessed on May 28, 2021 at:
https://www.oregonlive.com/portland/2014/09/mayor_charlie_hales_pushing_fo.html

body cameras.[88] It did not happen. The Bureau has a policy governing in car cameras, none has ever been implemented.[89] In a report dated April 14, 2021, the City's own outside consultant similarly recommended the PPB implement the use of cameras: "We continue to strongly recommend that PPB request body worn cameras to demonstrate evidence-based policing, improve training and supervision, and dramatically increase accountability to the public."[90]

As a result of either the City's or the PPB's consistent efforts to avoid transparency, Portland is by far the largest city in America where the police do not wear body cameras and do not use in car dash cameras. [91] The lack of cameras is routinely justified by insufficient funding.[92] That excuse is patently false. For nearly a decade the USDOJ has given hundreds jurisdictions around the nation millions of dollars to buy body cameras.[93] In Oregon, that money

---

[88] "Federal judge considers ordering some Portland police to wear body cameras" by Rebecca Ellis, OPB, dated January 13, 2021 accessed on May 28, 2021 at: https://www.opb.org/article/2021/01/13/portland-police-body-cameras/
[89] *See* PPB Policy 0630.70 Mobile Audio Video Procedure accessed on June 10, 2021 at: https://www.portlandoregon.gov/police/article/533205
[90] *See* "COMPLIANCE OFFICER AND COMMUNITY LIAISON, Feedback on PPB's Crowd Control and Force Management Documents" by Rosenbaum & Associates, for the City of Portland, Oregon dated April 14, 2021 accessed on May 28, 2021 at: cocl_assessment_ppbcrowdcontrolplan_4142021submitted.pdf (documentcloud.org)
[91] *See* "*Portland is only large city in America whose police officers don't wear body cams*" Kyle Oboshi, KGW accessed May 28, 2021 at: https://www.kgw.com/article/news/investigations/portland-is-only-large-city-in-america-whose-police-officers-dont-wear-body-cams/283-d0a7619b-32bd-44d9-948f-048233b9df58
[92] *Id.*
[93] *Id.*

has gone to 13 different law enforcement agencies, including Springfield, Pendleton, Gresham, Lincoln County, University of Oregon, Redmond, Washington County, Hillsboro, Marion County, Portland State University, Beaverton, Medford and Eugene.[94] The City of Portland has never applied for a Body-Worn Camera Policy and Implementation Program grant.[95] Every significant police department in the Metro area except the PPB rely on cameras.

Instead of implementing these basic systems, the PPB continues to resist, and as a result this court's constitutional duty to protect Mr. Moore from the officers' unlawful overreach is compromised. The PPB knows that video and audio recordings have led to police being prosecuted for criminal activity. The PPB knows that video evidence has led to the suppression of evidence in this District.[96] Transparency would protect everyone and the PPB has relentlessly avoided it. The only explanation is that transparency would expose the PPB as the racist institution it is and always has been. This must weight against the credibility of these officers' testimony.

---

[94] *Id.*

[95] *Id.*

[96] *See United States v. Jackson*, 321 F.Supp.3d 1223 (D. Or. 2018)(Judge Aiken granting defendant's motion to suppress gun, methamphetamine, and cash seized from his car based on audio/video footage of traffic stop); *United States v. Abarza*, 143 F. Supp. 3d 1082, 1086 (D. Or. 2015) (Judge McShane granting motions to suppress while acknowledging, "The dash-cam video has been very useful to my findings on the circumstances of this traffic stop.").

This court had a long career in law enforcement. During that time, it undoubtedly depended on the testimony of many PPB officers. Times have changed since 2009. There is overwhelming empirical evidence that the PPB GVRT's egregious lack of transparency, and its failure to document its official activities reflect an institution that is deeply racist and compromised. This is turn must influence how the court views the testimony of the officers representing this institution when considering the totality of the circumstances.

2. **Statement of Facts:**[97]

    A. <u>A white man lied to the PPB and the officers knowingly connected that lie to Mr. Moore.</u>

At 6:58 pm on April 17, 2020, a white man called 911 to complain about noise coming from a group of Black men at the Lone Fir Cemetery.[98] The police did not respond. An hour later, the frustrated white man called back and this time the white man's white lie was perfect: "The caller reported that the subject pulled a shotgun from the ground pointed it at comp and said 'get the fuck out of here or I'll shoot you in the fucking face.' The caller described

---

[97] The facts are in dispute and will be determined by the court. This information comes from the discovery and defense investigation.

[98] *See* Defense Chronology of Events on April 17, 2020 gleaned from discovery attached as Exhibit 3.

to dispatch that the subject was a black male, 30 years old, heavy set, black hoody, and blue jeans."[99] It is 8:09 p.m., and, believing the gathering is a gang event, members of Portland's racist Gun Violence Reduction Team ("GVRT") are converging on the Lone Pine Cemetery in response to the call.[100] It is 18 minutes until PPB GVRT stops Mr. Moore.

This subject description appears important according to the reports. Officer Espana's very first investigative observation of the interior of the vehicle connects Mr. Moore to the subject description: "I could see a clean black athletic sweatshirt or hoody laying on the front passenger seat floorboard. Kneko has similar articles of clothing as to what was described as the suspect with a shotgun."[101]

Espana's fellow team member, Dewey, confirms the subject description as a significant in the first paragraph of his report of April 18, 2020: "One of the callers stated a male wearing dark clothing picked up a shotgun and pointed it at him."[102] After they stop Mr. Moore, Dewey, like Espana attempts to connect Mr. Moore to the subject description: "I also noticed the clothing Moore was wearing was very similar to the description provided to Officer

---

[99] *See* Espana Report dated April 17, 2020 at 4 attached as Exhibit 4; *See* Exhibit 3 at 8 (transcript).
[100] Report of PPB Madison Dewey dated April 18, 2020 at 1 attached as Exhibit 5.
[101] Exhibit 4 at 5.
[102] Exhibit 5 at 1.

Espana of the subject with the gun in the cemetery. Moore was wearing black pants and there was a black jacket on the front passenger floorboard."[103] The problem is that the subject description was false and alleged a crime that never occurred. It was a white man's lie.

The further problem is that Espana, Dewey, and their supervisor, Sgt. Defrain, all knew that there was no "subject", and this description was false before they contacted Mr. Moore on April 17, 2020.[104] They also knew it when they created the only records of this stop. Espana says that he talked with the white man complainant and he gets a different description than that provided to dispatch. This time, according to the report Espana wrote hours later, he was told the subject was wearing black jeans and had picked up a shotgun.[105]

But for the tiny piece of this event that was recorded for posterity, the defense, and the court, would have proceeded to believe the white man's lie and its connection to Mr. Moore. While it tells us nearly nothing else, miraculously, the CAD reveals that at 8:20 pm, Sgt. Defrain announces through dispatch to everyone involved that the white man lied about the

---

[103] Exhibit 5 at 2.
[104] Exhibit 3 at 1,8.
[105] Exhibit 4 at 4.

subject description and the shotgun.[106] Dewey and Espana stop Mr. Moore at

8:27 pm, six minutes after hearing Defrain say the description was false.[107]

It is a significant fact that the initial subject description was false and

no one was threatened with a shotgun, but these two GVRT officers, and their

supervisor, intentionally omitted it from their official written reports.[108] These

are the only official reports of this event and they omitted this key fact.[109] The

reasonable inference is that they omitted this inconvenient truth because the

disgruntled white man's lie to the police did not support their warrantless entry

into Mr. Moore's vehicle.[110]

Not only did GVRT omit this key fact, they falsely linked Mr. Moore

to the white man's lie. Defrain, the supervisor, was the one who broadcast to

the entire team that the subject description was false before Mr. Moore was

stopped.[111] He never puts it in his report.[112] Then on April 19, 2020, Defrain

approved both Dewey and Espana's reports that falsely link Mr. Moore to the

---

[106] Exhibit 3 at 1.

[107] *Id.*

[108] *See* Exhibit 4,5; *see also* Report of Sgt. Defrain dated April 19, 2020 attached as
Exhibit 6.

[109] BOEC and CAD are not available to the public. The defense would not be able to
obtain it except with the government's assistance.

[110] The white man was never cited for initiating a false police report under ORS 162.375
even though he could have gotten Mr. Moore killed.

[111] Exhibit 3 at 1.

[112] Exhibit 3 at 1.

white man's lie.[113] Again, it is fair to infer that Defrain approved these reports because he ordered Mr. Moore arrested for nothing.[114] Espana included information Defrain just told him was false in his official report to bolster a fictitious claim of probable cause to cover for his supervisor, Defrain, who ordered him to arrest Mr. Moore for nothing. The same goes for Madison.[115]

Furthermore, the bogus subject description did not match Mr. Moore's clothing or build. For reasons that are unexplained in the report, but most certainly related to the GVRT's racist orientation and investigative motive, all these officers claimed to be familiar with Mr. Moore as a federal felon and alleged gang member. If so, they knew that Mr. Moore is a thin man and the subject description was a heavy-set Black man.

The officers also falsely suggest that Mr. Moore's clothing matched the subject. Dewey writes: "Moore was wearing black pants and there was a black jacket on the front passenger floorboard."[116] The initial subject description was someone wearing "blue jeans" and a "black hoody" not black pants and black jacket.[117] Espana writes: "I could see that Kneko was wearing a white t-shirt and black athletic pants…. Kneko has similar articles of clothing to what

---

[113] Exhibit 5 at 5; Exhibit 6 at 1.
[114] Exhibit 6 at 2.
[115] *See* Exhibit 5.
[116] Exhibit 6 at 2.
[117] Exhibit 3 at 1.

was described as the suspect with a shotgun." Again, the false description was of a heavy set Black man wearing "blue jeans" and a "black hoody" not a thin Black man wearing "a white t-shirt and black athletic pants." Both Dewey and Espana falsely suggest a connection between this non-existent, fictional subject description in their reports which are then approved by Defrain.[118] Why? The simplest answer that that this is how a corrupt, racist organization protects itself. Again, it bears emphasizing that but for the random chance of Defrain broadcasting that the suspect description was false and dispatch typing that on the CAD, no one would know.

    B. The "traffic" stop is tainted by the officers' intentional reliance on false information.[119]

According to discovery, at 8:27 pm, PPB GVRT Officers Espana and his partner, Madison, pull over Mr. Moore who is driving a rented black Nissan Sentra.[120] From this point forward, there are no more BOEC recordings of any of the GVRT officers' communications. As a result, we have nothing more than the officers' written reports. Madison reports that he is the first to contact Mr. Moore and requests driving documents from him.[121]

---

[118] Exhibit 4 at 1; Exhibit 5 at 1.
[119] There will be a dispute about the facts making the absence of audio and video recordings even more problematic.
[120] Exhibit 3 at 2.
[121] *Id.*

Madison says Mr. Moore failed to provide adequate proof of insurance, a traffic violation for which Mr. Moore is never cited.[122] Madison says he has probable cause to arrest Mr. Moore for reckless driving and failure to yield but never arrests him.[123] In fact, no one officially "arrests" Mr. Moore for more than 30 minutes after the stop, after the traffic officer cleared him, when he is arrested for "interfering with a police officer."[124] Yet another crime for which he is never cited.

Madison suggests that it took Mr. Moore several minutes to find his rental agreement.[125] Mr. Moore disagrees.[126] Mr. Moore provided his Oregon Driver's License immediately to the officer when he reached the car door and it took him no more than 90 seconds to produce the rental agreement.[127] Madison's traffic investigation appears to be over because he concludes that Mr. Moore's car is a hazard because he has not provided proof of insurance and has committed misdemeanor reckless driving.[128] However, at that point, nothing he does is consistent with those conclusions.

---

[122] Exhibit 5 at 2-3.
[123] Exhibit 5 at 3.
[124] Exhibit 6 at 2.
[125] Exhibit 4 at 6.
[126] Exhibit 7 at 1-2.
[127] Exhibit 7 at 2.
[128] Exhibit 5 at 3-4.

Both Madison and Espana provide a buffet of phony, post hoc rationalizations for their conduct during the stop and to justify their warrantless search of Mr. Moore's car in their official reports.[129] According to both, Mr. Moore matches the exaggerated description of a non-existent subject.[130] They note Mr. Moore is more nervous than most people.[131] Of course, they fail to note that this nervousness might be occurring because he is a Black man being stopped by the racist GVRT, there are flashlights shining in his face, there is a gun pointed at him, and the officer falsely suggested that his license was invalid.[132] Seemingly forgetting that he accused Mr. Moore of jumping a curb, Espana suggests that it is suspicious that Mr. Moore's jacket is on the floorboard and not somewhere else.[133] Espana finds it suspicious that Moore appeared cold but did not want to put on his jacket.[134] Mr. Moore says it was a warm evening and he was not cold.[135]

The buffet of post-hoc, phony rationalizations continues with Madison's conclusion that Mr. Moore is suspicious because when he pulled over, his car was well over a foot into the lane of travel.[136] This conclusion

---

[129] *Id.*
[130] Exhibit 4 at 6; Exhibit 5 at 2.
[131] Exhibit 4 at 6; Exhibit 5 at 3.
[132] See Declaration of Kneko Tyray Moore attached as Exhibit 7 at 2.
[133] Exhibit 4 at 5.
[134] *Id* at 6.
[135] Compare Exhibit 4 at 6 and Exhibit 7 at 1.
[136] Exhibit 5 at 2.

ignores that Mr. Moore is justifiably nervous as a Black man being stopped by a racist GVRT PPB officer and may not do the best job of parking with flashing lights behind him. It also appears to be untrue. Remarkably, one of the few things the officers did was take a picture of how Mr. Moore's was parked.[137] It may not have been perfect parking but he was not "well over a foot into the lane of traffic" given that parking was allowed on that side of the street.[138] The car was obviously not a hazard to traffic.

This phony traffic "hazard" finds its way into the official reports in a further attempt to justify the search as an inventory.[139] In Espana's report it says that Mr. Moore's vehicle is impounded is because it is a "hazard/blocking."[140] The car is not, however, blocking the road such that it is a hazard based on the photographic evidence.[141] Furthermore, by the time all of this was happening, more than a half hour after the stop, Mr. Moore's mother and cousin were on scene prepared to take control of Mr. Moore's vehicle and possessions.[142] It is another significant lie by omission that none of the reports indicate the Mr. Moore and his mother repeatedly told the

---

[137] Photo of Mr. Moore's car taken April 17, 2020 provided in discovery attached as Exhibit 8.
[138] Id.
[139] Exhibit 4 at 2. The flawed impoundment and inventory are discussed further below.
[140] Id.
[141] Exhibit 8.
[142] Exhibit 7 at 2.

officers someone was present that could lawfully drive the car. Under these circumstances, PPB could not impound Mr. Moore's car. [143] The officers impounded it because they wanted to search Mr. Moore's car for reasons unrelated to any traffic stop or a bogus subject description. This too violated policy.[144]

Because Mr. Moore is nervous, Madison says he demanded Mr. Moore give him the car keys and Mr. Moore refused.[145] Mr. Moore says that he was never asked for the keys.[146] There is discussion of his federal parole status and Madison's relationship with Mr. Moore's Washington federal probation officer.[147] Then the officers lie by omission in failing to report that Mr. Moore was asked for consent to search the vehicle and Mr. Moore refused.[148] In fact, throughout the course of his interactions with the GVRT before being arrested, Mr. Moore was repeatedly asked for consent and then threatened with arrest for denying it.[149]

While Madison is back at the patrol vehicle, Espana claims to engage in conversation unrelated to the traffic stop.[150] Mr. Moore does not recall ever

---

[143] PPB Policy Directive ("DIR") 630.60-4.2.3. *See* Exhibit 9 attached.
[144] DIR 630.60-4.2.1, 4.2.3, 4.3.2.
[145] Exhibit 4 at 2.
[146] Exhibit 7 at 2.
[147] *Id.*
[148] *Id* at 2
[149] Exhibit 7 at 3-4.
[150] Exhibit 7 at 2.

speaking with Espana.[151] Again, here it appears the officers have invented interactions that support their claims of probable cause. Having been refused consent to search, Espana then decides that Mr. Moore smells strongly of alcohol and is slurring his words.[152] Somehow Officer Madison never noticed the strong smell of alcohol despite being in direct contact with Mr. Moore first.[153]

There are 22 officers standing around, and apparently no one is capable of conducting basic sobriety tests.[154] Espana's report gives the impression that Mr. Moore consented to wait for a traffic officer to bike to the location.[155] That is not true. What actually occurred is that Mr. Moore was told he could not leave unless he passed sobriety tests.[156] He is made to wait until the traffic officer Gaither arrives on  bike at 8:41 pm. Espana reports that Mr. Moore consented to exiting his car and being patted down.[157] That is not true. What actually occurred is that Mr. Moore was ordered to exit his vehicle and was patted down.[158] Nothing was found on him.[159]

---

[151] Exhibit 7 at 2.
[152] Exhibit 4 at 6.
[153] Exhibit 5 at 1.
[154] *Id.*
[155] *Id.*
[156] Exhibit 7 at 3.
[157] Exhibit 4 at 6
[158] Exhibit 7 at 2.
[159] Exhibit 4 at 6.

The traffic officer administered then tests over about a 12 minute period between 8:41 pm and 8:53 pm.[160] Mr. Moore passed, Gaither told Mr. Moore he was good to go and that he was not intoxicated.[161] In violation of PPB Policy, Officer Gaither does not submit a report despite his significant involvement in the stop.[162] That he does not submit a report stating that he cleared Mr. Moore is significant because Espana lies by omission and continues to pretend in his report that Mr. Moore is intoxicated.[163]

At this point the officers seemed confused about what to do because he did not fail the sobriety tests.[164] Defrain reports a very timely and completely bogus anonymous tip from a "white female" who might have overheard a conversation between two Blacks she did not know that might have related to the traffic stop and harming the police.[165] There is simply nothing suggesting a credible threat except perhaps, that it comes from a "white female" to a white officer regarding Blacks. Lest we forget, at this point Mr. Moore is out of his car and has been patted down for weapons.[166] He is no threat to anyone. This is just more made up nonsense to support a warrantless and unlawful search.

---

[160] Exhibit 3 at 2.
[161] Exhibit 7 at 3.
[162] PPB Policy Directive 900.00-1.2.1.1 attached as Exhibit 10.
[163] Exhibit 4 at 7.
[164] Exhibit 7 at 4.
[165] Exhibit 6 at 2.
[166] Exhibit 4 at 6.

Madison then claims that he informs Mr. Moore that he "wasn't going to be able to drive the car away from the scene. We had probable cause to arrest Moore for reckless driving and planned on towing the car due to it being a hazard and not having insurance."[167] This is in direct violation of PPB Policy.[168] That was also all true 30 minutes earlier, but he never acted on it then, and he fails to act on it again. Even if they were going to arrest him, policy directs them not to impound the car under these circumstances.[169]

Defrain arrives at that point with this "white female's" anonymous tip that according to Espana is "critical to officer safety" and tells Moore they are going to search his car.[170] Mr. Moore has still not been arrested at this point. Mr. Moore argues with Defrain about searching his vehicle and according to Defrain he asked Moore to step back.[171] When Mr. Moore did not step back sufficiently, he was arrested for "interfering with a police officer."[172] The officers conduct "an inventory" search of the vehicle and find the handgun underlying the current indictment.

---

[167] Exhibit 5 at 3.
[168] This violated PPB Policy Directive 630.60-4.2.2. *See* Exhibit 9. The numerous violations of PPB Policy are discussed infra at 3.b.
[169] *See* Exhibit 9
[170] Exhibit 4 at 7; Exhibit 6 at 2; Exhibit 7 at 4.
[171] *Id.*
[172] Exhibit 6 at 2.

The officers' reports give the impression that all of this took just a few minutes. Because there are no audio or video recordings, the BOEC ends when the stop begins, and the CAD output is incomplete, the defense can only partially reconstruct a timeline of events. This represents yet another absurd example of the PPB's intentional opacity. We do not know exactly when Mr. Moore was stopped. We do not know when exactly Mr. Moore was "arrested."

In fact, we would know next to nothing about a chronology without the hours of defense effort and expense that went into creating Exhibit 3. Based on the records received from the government, it appears that Mr. Moore is pulled over at 8:27 pm and the traffic officer does not arrive to do the sobriety tests until 8:41 pm, nearly 15 minutes after the initial stop.[173] At 8:53 pm, the traffic officer clears Mr. Moore to leave.[174] At 9:05 pm photos are taken of Mr. Moore's car, from which the defense infers that he had been placed under arrest by that time, 38 minutes after he is stopped. Mr. Moore is not transported from the scene until 9:39 pm, more than an hour after the traffic stop began.[175]

### 3. Legal Arguments:

A. Mr. Moore has a reasonable expectation of privacy in the rental car he was driving on April 17, 2020.

---

[173] Exhibit 3 at 2.
[174] *Id* at 3.
[175] *Id.*

Mr. Moore rented the vehicle he was stopped in and has an expectation of privacy in his rental vehicle.[176] The officers note that Mr. Moore's rental agreement expired that day, and Mr. Moore says he extended it, in either case it is immaterial to his expectation of privacy.[177] Under Supreme Court caselaw Mr. Moore still possesses an expectation of privacy in that Black Nissan.[178] When an individual has a reasonable expectation of privacy, enforcement may not conduct a search absent a search warrant, consent, or some other exception to the warrant requirement.[179]

//

B. <u>The officers repeatedly violated PPB Policy directives in their encounter with Mr. Moore.</u>

The PPB officers repeatedly violated PPB policies in how this stop, arrest, vehicle impoundment, and inventory search were conducted and documented. None of the officers' reports provides meaningful chronology of the events or any sense of how much time is passing during their "traffic investigation". Under these policies, none of the alleged offenses allowed

---

[176] *Byrd v. United States*, 138 S. Ct. 1518, 1528, 200 L. Ed. 2d 805 (2018)
[177] *Id.*
[178] *Id* at 1529 (2018).
[179] See *Kentucky v. King*, 563 U.S. 452, 459 (2011)

arresting him as opposed to citing him. Under these policies, none of these alleged "crimes" allowed the officers to impound his vehicle and search it when Mr. Moore's cousin was present and able to drive the car lawfully. The officers violated inventory policy when they searched the car to look for evidence of a crime.

> i. Officers violated PPB Policy Directive 0900.00 concerning written reports.

It is just unbelievable, really, that in the 21st Century when every officer was carrying a video and audio recording device during this stop, not one was used except to take 8 still photos of the vehicle after Mr. Moore was arrested. In the PPB's pre-industrial revolution culture of accountability, the Blacks they target are still ¾ of a person. Since nothing is recorded in real time and events are only documented by taking notes after the fact, then writing a report from those notes even later after the fact, there is almost no chance of being caught in a lie and no "fact" capable of true, objective verification.[180] Nevertheless, one would assume that there would at least be some superficial effort at completeness and accuracy. That assumption is misplaced.

22 officers were there and 3 submitted reports. What were the other 19 doing? Acting "unofficially?" At least two officers that made critical

---

[180] See Exhibit 10 generally.

observations and took police action failed to submit reports as required by policy. DIR 0900.00-1.2.1.1. states: "Members taking any official police action, on or off duty, shall write and submit an appropriate report to cover the incident, except in cases where the coded disposition sufficiently captures the resolution of the event."[181]

Traffic Officer Gaither conducted field sobriety tests on Mr. Moore and determined that he was not DUII.[182] When Gaither fails to file a report indicating that he cleared Mr. Moore, it allows Espana to lie by omission and fail to report that Mr. Moore was not DUII. It also allows GVRT to unlawfully extend the traffic stop without any basis. Gaither's failure to generate a report is inconsistent with PPB policy.[183]

Similarly, before the 22 GVRT officers showed up on the scene to harass a group of Black people based on a white man's lie and other white people's complaints about "loud rap music", the GVRT has a plain clothes officer, Hughes, observing the event.[184] Hughes was allegedly able to identify

---

[181] Exhibit 10 at 1.
[182] Exhibit 7 at 3.
[183] Exhibit 10 at 1.
[184] Exhibit 4 at 3.

multiple alleged gang members, who are all Black, at the event.[185] This included Mr. Moore.[186]

Hughes was conducting surveillance at this event before the phony shotgun menacing call even came in.[187] Why? What time did he start watching the group? When he heard the shotgun menacing subject description come in, why didn't he see a heavy-set Black man in his 30's carrying a shotgun and menace the white man living 20 feet away from the barbeque? If he did not see it, that would be important. Again, Hughes fails to document anything he did or saw during the time he was surveilling this group. This is inconsistent with DIR 0900.00-1.2.1.1 and further obscures the search for the truth.

None of the reporting officers provides a meaningful timeline or chronology of events as required by DIR 0900.00-1.2.1.6.[188]  Espana's report has a time of 9:01 pm as the occurrence time on the first page.[189] He reports a complaint to dispatch occurring at 6:56 pm and another at 7:41 pm.[190] At 8:08

---

[185] *Id.*

[186] *Id.* One of those Hughes identified is Teondre Bonner. Like Mr. Moore, in 2018 Bonner was subjected to a bogus traffic stop by the PPB which uncovered a gun. Judge Simon suppressed the evidence in the case against Bonner finding there was no consent to search and the officers did not conduct a proper inventory. *See United States v. Bonner, 393 F. Supp. 3d 1063, 1065 (D. Or. 2019)*, Case 3:18-cr-00500-SI ECF 49(Order Suppressing Evidence)

[187] Exhibit 4 at 4.

[188] Exhibit 10 at 2.

[189] Exhibit 4 at 1

[190] Exhibit 4 at 4.

pm the false menacing complaint is lodged.[191] And then the timeline ends. Espana does not provide times for any of the critical actions that occur after 8:08 PM. This an especially crucial oversight when there is literally nothing else documenting timing. That is inconsistent with PPB policy requiring a chronology of events.[192]

The officers lied by omission and filed incomplete reports by failing to document several critical facts. The officers fail to report that Mr. Moore was asked, repeatedly, for consent to search the car and he refused, repeatedly.[193] The officers also fail to report that Mr. Moore's mother and cousin were on scene and could lawfully drive the vehicle.[194] The officers fail to report that they refused to allow Mr. Moore's mother and cousin to take the car and Mr. Moore's property.[195] These omission violate policy requiring an accurate and objective depiction of the facts including exculpatory information.[196]

Finally, by linking Mr. Moore falsely to a non-existent criminal suspect accused of threatening someone with a shotgun, Madison, Espana, and their supervisor Defrain all violated DIR 0900.00-1.2.1.4.[197] These failures

---

[191] Exhibit 4 at 4.
[192] Exhibit 10 at 2.
[193] Exhibit 7 at 2.
[194] *Id.*
[195] *Id.*
[196] Exhibit 10 at 2.
[197] *Id.*

undermine the credibility of the officers and call into question the entirety of the narrative contained in the written reports.

> ii. The officers violated PPB Policy Directive 0630.60 when impounding Mr. Moore's car.

PPB Policy Directive 0630.60 establishes rules and procedures for impounding a vehicle. The policy makes it apparent why Madison lied about the vehicle being a hazard.[198] He lied because "[m]embers may impound a vehicle under this section only when primarily motivated by the community caretaking issue presented by the vehicle rather than any punitive or investigative motivation."[199] Defrain's own words to dispatch prove the investigative intent of these officers: ""It's a gangster party, people that we know….we'd like to catch somebody dropping something or doing something taking off on us."[200] The sheer number of officers involved here and the manner of the stop demonstrates that is was an investigation and not simply a "community caretaking issue" caused by a vehicle.[201] Only by calling the car a "hazard" could the GVRT attempt to justify the search.

---

[198] Exhibit 4 at 2.
[199] PPB Policy Directive 630.60-4.2.1
[200] Exhibit 3 at 1.
[201] Exhibit 1.

The problem for the government is that the car was not a hazard to traffic and did not present some other community caretaking need.[202] Significantly, throughout the interaction Madison reports that Mr. Moore's lack of proof of insurance (he was in fact insured) made the car a hazard justifying the impound.[203] Madison violates policy which commands: "Lack of insurance alone does not support a community caretaking impoundment."[204] Yet lack of insurance is exactly what Madison cites as the hazard allowing them to impound the vehicle and conduct an inventory search.[205]

The officers again violate this DIR when they refuse to allow Mr. Moore's cousin to take the vehicle before impounding it.[206] This too supports Mr. Moore's contention that this was an investigation rather than a community caretaking effort. DIR 630.60-4.2.3 states that Mr. Moore's car should not have been impounded:

> "Members should not impound a vehicle under this section if the owner or person in control of the vehicle consents to have a lawful driver, who is present at the scene, safely move the vehicle

---

[202] Exhibit 8.
[203] Exhibit 5 at 2; Exhibit 4 at 6
[204] Exhibit 9 at 1 (DIR 630.60-4.2.2).
[205] Exhibit 5 at 3("At this time his car was a hazard and wasn't able to drive without first providing proof of insurance….planned on towing his car due to it being a hazard and not having insurance…."); *see United States v. Garay,* 938 F.3d 1108, 1111 (9th Cir. 2019)("searches that materially deviate from department policy can be invalid")
[206] Exhibit 9 at 1 (DIR 630.60-4.2.3)

to a location that no longer presents a community caretaking issue. Members may wait for such a person to arrive, but are not required to if such person is not present at the time the officer requests tow service.

Mr. Moore was the person "in control" of the vehicle. Assuming that the officer believed that the car being parked 14 inches from the curb created a hazard, Mr. Moore's cousin and mother were on scene long before a tow was called and were prepared to take the car.[207] Mr. Moore repeatedly requested that they be allowed to take the car if he was going to be arrested.[208] This policy violation demonstrates the investigative intent involved here. Furthermore, the policy prohibits impounding a vehicle based solely on the arrest of the driver.[209]

These officers did not care one whit about a traffic violation. It was a gangster party and they wanted into Mr. Moore's car. They proved they were willing to violate policy to achieve that end. This gross violation of policy undermines the officers' credibility and indicates that this was an unreasonable search under the Fourth Amendment.

    iii.  <u>This was not a lawful inventory search consistent with PPB policy.</u>

---

[207] Exhibit 7 at 2, 3.
[208] *Id.*
[209] Exhibit 9 at 1(DIR 0630.60-4.2.3)

At the outset, there never should have been an inventory because the police had no right to impound the car based solely on the lack of insurance in the first instance.[210] Under policy, they were also required to release it to Mr. Moore's cousin.[211] That makes the case different from those finding that the PPB had to search a vehicle because they had to impound it.[212] Here they did not.

Mr. Moore acknowledge the inevitable discovery doctrine acts as an exception to the exclusionary rule and permits the admission of otherwise excluded evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police."[213] Mr. Moore also accepts that the inevitable discovery doctrine may apply because evidence "would have been discovered through a lawful inventory procedure."[214]

When inventory searches are conducted, the "actual motivations [of law enforcement] do matter."[215] The Ninth Circuit therefore requires that when

---

[210] Exhibit 9 at 1.
[211] Exhibit 9 at 1 (DIR 630.60-4.2.3).
[212] *See e.g. United States v. Penn*, 233 F.3d 1111, 1116 (9th Cir. 2000)
[213] *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)).
[214] *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986).
[215] *United States v. Orozco*, 858 F.3d 1204, 1210 (9th Cir. 2017) (emphasis in original).

inventory or other programmatic searches are conducted by law enforcement, a court must

> "inquir[e] into an officer's purpose in conducting a stop or search without reasonable suspicion or probable cause, when such an intrusion is sought to be justified pursuant to the administrative search doctrine, and where the defendant has come forward with objective evidence to suggest that the intrusion was not made for the purpose of enforcing the administrative inspection scheme."[216]

The mere "presence of a criminal investigatory motive" or a "dual motive—one valid, and one impermissible" does not render an administrative stop or search invalid; instead, the Court must determine whether the challenged search or seizure "would . . . have occurred in the absence of an impermissible reason."[217]

They did not actually inventory the car and its contents only the evidence of the crime.[218] There was a backpack in the car.[219] It is not inventoried. Mr. Moore's jacket was in the car. His cellphone was seized. None of that ends up on the Property and Evidence Receipt.[220] The property

---

[216] *Id*. at 1212-13.
[217] *Id.*
[218] *See* PPB property and evidence receipt attached as Exhibit 13.
[219] Exhibit 7 at 1.
[220] Exhibit 13.

and evidence receipt lists only the gun, the ammunition, the magazine, and the DNA swabs.

"Members may impound a vehicle under this section only when primarily motivated by the community caretaking issue presented by the vehicle rather than any punitive or investigative motivation."[221] Because the PPB improperly impounded the car based only on Mr. Moore's lack of insurance and without releasing it to his cousin, they were not entitled to have it towed and inventoried.[222] That strongly indicates an investigative motive. Why else would you refuse to release the car in direct contravention of policy?

Beyond policy violations, everything about what occurred here indicates a motive to investigate and obtain evidence rather than accomplish an administrative task. The entire event begins with an investigation of a false claim that a Black man, heavy set, in his 30's wearing black jeans and a black hoody menaced a white man with a shotgun. Even after learning that is untrue, they falsely attempt to link Mr. Moore to this non-existent subject and non-existent crime. That strongly indicates an investigative motive.

They accuse Mr. Moore of reckless driving but collect no evidence and never arrest him for it. They issued no traffic citations. They discuss all kinds

---

[221] *Id.*
[222] Exhibit 9 at 1.

of issues unrelated to the traffic stop. They try and take his keys away. They repeatedly ask for consent to search the vehicle and then threaten him for refusing. They include background information about gang associations and prior history with firearms in their reports. They are all members of a special "Gun Violence Reduction" team receiving millions of dollars to target Blacks and use consent searches to find guns.

To pursue their phony DUII claim they must call a traffic officer *to ride his bike to the scene* because not one of them can conduct DUII testing. They make Mr. Moore sit for ten minutes and then the traffic officer says Mr. Moore isn't DUII. Of course, that officer never writes a report.

At 8:08 pm Defrain briefs Air1 as follows: "It's a gangster party, people that we know....somebody now called and said that they pointed a shotgun at him when he asked 'em to quiet down....we don't have enough resources to deal with them all but we'd like to catch somebody dropping something or doing something taking off on us."[223] An hour later Defrain is the same Sergeant who orders Mr. Moore arrested for interfering with a police offer to justify an inventory search.[224] The officer's word demonstrate forcefully that what occurred here was not community caretaking and administrative but an

---

[223] Exhibit 3 at 1.
[224] Exhibit 6 at 2.

arrest to justify an inventory that would further the investigation of a crime. They were obviously there to find a gun on a Black suspected gang member, not address a traffic stop and a poorly parked car. They ran out of ways to arrest Mr. Moore when he passed the sobriety testing, so they made one up ("interfering with a police officer").

They seize Mr. Moore's cellphone without a warrant or probable cause only to return it later when counsel demanded its return. It was never searched but it was obviously seized in violation of the 4th Amendment further suggesting an investigatory motive.

Because they are investigating, they impound his car in violation of policy even though he is not blocking the road and his cousin is there ready to take the car.[225] They try and connect him to a menacing suspect who both menaced no one and did not match Mr. Moore. They falsely try to connect him to a "white female's" anonymous tip suggesting Mr. Moore might be a threat except at this point he is out of his car and been patted down by officers.

This is not community caretaking or administrative endeavor. The only property inventoried are the gun, the ammo, and his DNA. This cannot be understood as anything other than a shakedown by a racist GVRT guessing that Mr. Moore had a gun but with no actual evidence.

---

[225] Exhibit 9. This too the officers magically fail to report.

C. <u>PPB did not have probable cause to stop Mr. Moore.</u>

It should weigh against any PPB GVRT probable cause claim that the only documentation of a traffic violation is one GVRT officer's observations put in report written many hours after the event. It is as though the PPB are operating in the 18th century and Joseph Nicéphore Niépce's 1814 invention of a device that could capture images, later known as the camera, was still 50 years in the future.

In almost any other jurisdiction in the United States, large or small, there would be dash camera video showing Mr. Moore driving recklessly if it had happened. Photographs of where he jumped the curb and almost hit a tree would be provided if it had happened. Witnesses that confirm the reckless driving would be interviewed if it had happened. The officer who saw the reckless driving would have acted differently if it had occurred.

This stop demonstrates how the PPB's lack of transparency obscures the search for truth. In a world where nearly everything is recorded, the court is reduced to taking the word of a representative of a racist officer working within a racist team for a racist department looking for an excuse to shake down a black man. It is also then forced to trust the flawed memories and incomplete reports of officers that knowingly included a false subject description in their reports and then linked it to Mr. Moore.

In 2018, the Portland City Auditor found that the PPB Gang Team used "traffic violations as a pretext to create opportunities to search for illegal guns or to arrest people for other crimes."[226] It also found that these stops targeted black people.[227] Pretext reasons include minor traffic violations, such as "changing lanes without a signal or infringing on a crosswalk" or in Mr. Moore's case, reckless driving, failure to yield, that he was never cited for.[228] In 2019, the City documented the same thing about the GVRT.[229] The PPB officers' "preferred tactic" of using traffic stops as pretext to target black people, impugns the credibility of any PPB claim that "traffic violations" supported this stop.

Besides the documented racist history of the GVRT, the officers' traffic investigation claim is undermined by the fact that other than initiate a traffic stop, the officers did nothing consistent with the reported belief that Mr. Moore had just committed an arrestable traffic offense. Madison claims that

---

[226] *See "*GANG ENFORCEMENT PATROL: The Police Bureau must show that traffic stops are effective" by Portland City Auditor, Audit Services Division, dated March 2018 at 2 accessed on May 28, 2021 at:
https://www.portlandoregon.gov/auditservices/article/677598
[227] *Id.*
[228] *Id*
[229] *See "In 2019, the Portland police Gun Violence team made 1,600 stops. More than half were Black people.*" Maxine Bernstein, Oregonian, dated November 19, 2020 comments of PPB Chief Lovelle accessed on May 28, 2021 at:
https://www.oregonlive.com/crime/2020/11/in-2019-the-portland-police-gun-violence-team-made-1600-stops-more-than-half-were-black-people.html

he had probable cause to arrest Mr. Moore for reckless driving at 8:27 pm but never arrests him. Mr. Moore is not arrested until at least 30 minutes later.

Despite 22 officers, Mr. Moore was not arrested. Mr. Moore is never cited for reckless, careless driving, or any traffic offense. The 22 officers collected no evidence of any traffic crime. The 22 officers did not interview any witnesses. There were 22 officers and a unit in the air and not one corroborates Dewey's report about Mr. Moore's driving except his partner Espana.

What about Air 1? The PPB is flying something around this event before and during the stop at a cost of untold thousands of dollars. What did it see circling around? Nothing, we must assume, because there is no report or anything else from this taxpayer funded flight. There is certainly nothing that confirms a car was driving recklessly, which would have been apparent to aircraft overhead.

Police officers are required to have "reasonable suspicion"—that is, "a particularized and objective basis for suspecting the particular person stopped" of breaking the law—to justify a traffic stop.[230] The officers' claim of a basis to stop him are belied by the actions they undertook once it began, including extensive, unreported efforts to win consent to search the vehicle.

---

[230] *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014).

The sheer number of PPB officers involved indicates that they were investigating much more than a traffic stop and that this was just a pretext to target a Black man.

D. The PPB GVRT officers unjustifiably prolonged the stop to investigate matters unrelated to the alleged traffic infractions.

After stopping Mr. Moore, a Black man, for alleged traffic infractions, the GVRT, a team of empirically established racist officers embedded in an empirically established racist institution, decided to search his car. It did not matter what Mr. Moore did or whether they had probable cause. When one of the officers requested consent to search the vehicle, and Mr. Moore refused, the officers circumvented his lawful refusal to consent by violating their own policies repeatedly.

In their official reports, GVRT officers falsely suggest that Mr. Moore matches a subject description that had been made up by a white man angry about police not responding to a noise complaint. When that did not get officers in Mr. Moore's car, an officer then made up evidence of intoxication and forced Mr. Moore to go through field sobriety tests without cause. Still failing to establish probable cause to arrest Mr. Moore for DUII and impound and search his car, they ended all pretense arrested him for nothing ("interfering with a police officer"), impounded and searched his car. The time

between when Mr. Moore was cleared by the traffic officer at 8:53pm, and when he was arrested sometime after 9:05 pm, was an unlawful extension of the traffic stop.

The Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."[231] This stop should have been over no later than the moment the traffic officer cleared Mr. Moore of DUII. A seizure justified only by a police-observed traffic violation … "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation.[232] These officers never had any intention of writing a ticket and their harassment of Mr. Moore extended more than half an hour.[233]

A traffic stop is "'[a] relatively brief encounter,'" in which "the tolerable duration of police inquiries ... is determined by the seizure's 'mission.'"[234] This "mission" is limited to "address[ing] the traffic violation that warranted the stop" and "attend[ing] to related safety concerns."[235] These

---

[231] *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015)

[232] *Id. See also Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

[233] Exhibit 3 at 1-3.

[234] *Rodriguez*, 135 S. Ct. at 1614 (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998), and *Caballes*, 543 U.S. at 407).

[235] *Id.*

officers' reports are an obvious attempt to shroud what was clearly an investigation into criminal activity as a traffic offense by constantly shifting the goal posts. "Authority for the seizure thus ends," the Supreme Court held, "when tasks tied to the traffic infraction are—or reasonably should have been—completed."[236]

When stopping an individual for a minor traffic violation, "an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'"[237] "[S]uch inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," as these checks are aimed at "ensuring that vehicles on the road are operated safely and responsibly."[238] The inquiries do not include discussions about relationships with parole officers, discussions about Mr. Moore's state of mind, patting him down, requests for consent, time being forced to wait for a traffic officer, time spent looking into his car, and requests for back up and the like.[239] All of this was complete by 8:53 pm, and therefore the stop was unreasonably extended.

---

[236] *Id.*
[237] *Id.* at 1615 (alteration in original) (quoting *Caballes*, 543 U.S. at 408).
[238] *Id.*
[239] *Rodriguez*, 135 S. Ct. at 1616.

"[T]he Court in *Rodriguez* explicitly rejected the government's argument that an officer can prolong a traffic stop to perform a non-traffic-related task 'so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances.'"[240]

More recently, the Ninth Circuit applied *Rodriguez* in holding that officers cannot extend a lawfully initiated vehicle stop because a passenger refuses to identify himself, absent reasonable suspicion that the individual has committed a crime.[241] The Court expressly recognized that "*Rodriguez* requires that a traffic stop may be extended to conduct an investigation into matters other than the original traffic violation only if the officers have reasonable suspicion of an independent offense."[242]. The Court ordered the suppression of all evidence seized by the police, because the repeated requests

---

[240] *United States v. McDuffie*, 671 Fed. Appx. 4900, 491 (9th Cir. 2016) (quoting *Rodriguez*, 135 S. Ct. at 166) (trooper impermissibly prolonged stop to call drug task-force agent where defendant was driving rental car that was rented to third party who was not in the car).

[241] *United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019)

[242] *Id*. at 867 (emphasis added) (citing *Rodriguez*, 135 S. Ct. at 1616); See also *United States v. Jackson*, 321 F.Supp.3d 1223 (D. Or. 2018) (Judge Aiken finding that officer's questioning of defendant about drugs and guns, after officer stopped him for alleged traffic violations, unreasonably extended duration of traffic stop in violation of the Fourth Amendment).

for his identification and eventual call for "backup" served to prolong the stop for "several minutes."[243]

Tasks not related to the traffic mission are unlawful if they "add[ ] time" to the stop, and are not otherwise supported by independent reasonable suspicion of wrongdoing.[244] Assuming for the sake of argument that the stop had not already been unlawfully extended several times already when PPB required Mr. Moore to wait for the traffic officer, it certainly was unlawfully extended when the traffic officer cleared Mr. Moore as safe to drive and he was further detained absent probable cause of another offense.[245] As a result all evidence seized from his vehicle should be suppressed.

E. <u>The officers did not have probable cause to believe there was a firearm in the car.</u>

Given all the other issues identified above, it should be obvious to the Court that Madison's guess about a firearm in the car is not legally supportable probable cause to search the car.[246] It is just another post hoc rationalization for unlawful police conduct.

---

[243] *Id*. at 865.
[244] *Rodriguez*. at 1616.
[245] *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019)
[246] Exhibit 5 at 3.

The only suggestion of any kind of firearm was the white man's lie describing a Black man among 40 Black men who did not match Mr. Moore at all, possibly picking up a shotgun, or maybe not.

GVRT's inherently racist bias and mission to find guns above all else is evident in what officers label "suspicious" behavior. Being exceedingly nervous is not "suspicious" when any Black man in Portland knows he has reason to fear for his life during a traffic stop.

In GVRT's world, Mr. Moore is forever a gang associate and therefore must have a gun, so they made up a reason to search for it. What it must learn is that does not work in Court. Mr. Moore's alleged association with a gang when he was 18 has nothing to do with possessing a weapon on April 17, 2020 when he was 38. Beyond generalities and boilerplate, nothing the officers cite amounts to probable cause to believe that a gun was in the car.

F.  Officers unlawfully collected Mr. Moore's DNA.

The Supreme Court held that "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search."[247] Warrantless searches "are per se unreasonable under the Fourth Amendment."[248] The government bears the burden of proving by a

---

[247] *Maryland v. King*, 569 U.S. 435, 446 (2013).
[248] *Katz*, 389 U.S. at 357.

preponderance of the evidence "that a warrantless search or seizure falls within an exception to the warrant requirement."[249] Its burden of establishing voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority."[250]

"[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."[251] The mere fact that an individual consented to a search does not automatically relieve the government of its burden of proving the search was "reasonable."[252] For instance, consent may be presumed involuntary where multiple police officers and squad cars surround an individual and officers engage in "immediately accusatory" questioning.[253]

Here, the warrantless collection of Mr. Moore's DNA following the warrantless search of the rental car and his arrest was both unlawful and

---

[249] *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).
[250] *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968).
[251] *Florida v. Royer*, 460 U.S. 491, 497 (1983).
[252] *United States v. Scott*, 450 F.3d 863, 868 (9th Cir. 2006).
[253] *United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013)

unreasonable.[254] Any purported consent from him was merely a submission to a claim of lawful authority.[255]

Mr. Moore had been placed under arrest. He was surrounded by GVRT officers. His acquiescence was not freely and voluntarily given. Suppression of the DNA swab is therefore warranted.

### 4. Conclusion:

For all the reasons, outlined above, the search of Mr. Moore's car was unlawful and all evidence emanating from it should be suppressed.

Respectfully submitted on June 29, 2021.

*s/Matthew Schindler*
Matthew A. Schindler, OSB#964190
Attorney for Kneko Moore

---

[254] *United States v. Bonner*, 393 F. Supp. 3d 1063, 1074 (D. Or. 2019)
[255] *Bumper v. North Carolina,* 391 U.S. 543, 548-49 (1968).