## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:20-cr-00474-IM-1 |
| v. | **OPINION AND ORDER** |
| **KNEKO TYRAY MOORE**, | |
| Defendant. | |

Scott Erik Asphaug, Acting United States Attorney, Gary Y. Sussman, Jacklyn Jean Jenkins, and Leah K. Bolstad, Assistant United States Attorneys, United States Attorney's Office, 1000 SW Third Avenue, Suite 600, Portland, Oregon 97204. Attorneys for the United States.

Matthew A. Schindler, 501 Fourth Street #324, Lake Oswego, Oregon 97304. Attorney for Defendant.

**IMMERGUT, District Judge.**

Defendant Kneko Moore is charged with violating 18 U.S.C. § 922(g)(1), Felon in

Possession of a Firearm. ECF 1. Defendant now moves to suppress evidence obtained following

a search of the vehicle he was driving, as well as the DNA swab taken following his arrest. ECF

21 at 67. He contends that Portland Police Bureau ("PPB") officers "unlawfully extended a

traffic stop and searched [his] rental car . . . in violation of the 4th Amendment," and as a result,

the evidence should be suppressed. *Id*. at 3. This Court held hearings on Defendant's motion on

PAGE 1 – OPINION AND ORDER

September 28, 2021, ECF 38, and October 15, 2021, ECF 44. This Court finds the testimony of

PPB Officers Madison and Espana, PPB Sergeant DeFrain, and former-PPB Officer Gaither to

be credible. Additionally, this Court finds Ms. Brown's testimony credible. After considering all

of the pleadings, the record, and the arguments of counsel, this Court finds that the traffic stop

and subsequent search did not violate the Fourth Amendment and the evidence obtained

therefrom is admissible. Specifically, this Court finds that the car stop was not unlawfully

extended and the search was justified under the automobile exception, or in the alternative, the

evidence seized would have been inevitably discovered pursuant to an inventory search.

Furthermore, the officers lawfully obtained a DNA swab from the defendant because he freely

and voluntarily consented to this search. Therefore, Defendant's Motion to Suppress is DENIED.

## BACKGROUND

On April 17, 2020, Defendant was part of a gathering at Lone Fir Cemetery, located on

Southeast 26th Avenue in Portland, Oregon.[1] The PPB had received "numerous calls regarding

an unruly gathering at the cemetery," and officers belonging to PPB's Gun Violence Reduction

Team ("GVRT") as well as PPB patrol officers responded to the scene. ECF 24 at 2; ECF 21 at

31; Transcript of Motion Hearing at 145, *United States v. Moore*, No. 3:20-cr-00474-IM-1 (D.

Or. Sept. 28, 2021) [hereinafter "Sept. 28, 2021 Tr."].

One of the individuals who reported the gathering to the police called 911 twice. At

approximately 6:57pm, he reported that there were "forty [to] fifty people" at the cemetery

having a barbeque in violation of the Oregon Governor's COVID-19 stay-at-home order. *See*

ECF 21-3, Def. Ex. 3, at 4; ECF 21 at 30. At approximately 8:06pm, he called again to report the

---

[1] These facts are drawn from parties' briefing on the Motion to Suppress, the supporting
exhibits, and the testimony given during the two hearings held on the Motion. Materially
disputed factual matter is noted in footnotes.

PAGE 2 – OPINION AND ORDER

disturbance at the cemetery. According to this second call, the caller walked over to the

cemetery, asked the group to be quiet, and one attendee "pulled a shotgun on [him]" and told him

to "get the fuck out of here or I'll shoot you in the fucking face." ECF 21-3, Def. Ex. 3, at 5–6;

ECF 21 at 30; ECF 24 at 3. The caller described the individual with the shotgun as a black male,

around thirty years old, heavy set, wearing a black hoodie and blue jeans. ECF 21-3, Def. Ex. 3,

at 6; ECF 21 at 31; ECF 24 at 3–4. The caller was not anonymous—he provided his name and

contact information. ECF 21-3, Def. Ex. 3, at 6.

At some point prior to 8:20pm,[2] Officer Espana, a fourteen-year veteran of the PPB,

contacted the caller by phone. ECF 21-4, Def. Ex. 4, at 5; Sept. 28, 2021 Tr. at 99. The caller

told Officer Espana that he saw a black male, thirty years old, wearing a black hoodie and *black*

jeans. ECF 21-4, Def. Ex. 4, at 5. The caller reported that the individual "pick[ed] up a shotgun

off the ground," and that it was a "pump-action shotgun," but no longer reported that the gun has

been pointed at him. *Id.*; *see also* ECF 21 at 32; ECF 24 at 4. Subsequently, at approximately

8:20pm, Sergeant DeFrain, who has spent nearly nineteen years with the PPB, largely responding

to gun or gang-related crime, and has been a sergeant since 2017, called Dispatch to report what

the caller said to the GVRT and patrol officers at the scene: "somebody picked up a shotgun

[but] didn't point it at anybody off the ground." ECF 21-3, Def. Ex. 3, at 9; Sept. 28, 2021 Tr. at

143–44; *see also* ECF 21 at 32–33.

A plainclothes officer, Officer Hughes, had also been observing the gathering at the

cemetery. ECF 21-5, Def. Ex. 5, at 2. Officer Hughes relayed information about the event to the

other officers, specifically that attendees included known members or associates of the Rollin'

60's Crips gang as well as convicted felons, and that attendees were drinking alcohol, and

---

[2] Officer Espana's contact with the caller occurred prior to Defendant's traffic stop.

possibly smoking marijuana. ECF 21-4, Def. Ex. 4, at 4; ECF 21-6, Def. Ex. 6, at 2; ECF 21-3, Def. Ex. 3 at 8 (also noting evidence of marijuana use); Sept. 28, 2021 Tr. at 18, 148. Officer Hughes also identified Defendant as one of the attendees present. ECF 21-4, Def. Ex. 4, at 4; Sept. 28, 2021 Tr. at 15–18.

The officers were aware that for the past "five or six years," the Rollin' 60's gang had held an annual spring event at various, "untraditional places," in Portland. Sept. 28, 2021 Tr. at 145–46. At one such prior event at Farragut Park, police had not responded, and a shooting took place. *Id*. at 146. At other events, police responded and recovered firearms from attendees. *Id*. The officers were also aware that in 2019, a shooting involving a different gang occurred at the Lone Fir Cemetery. The officers were also aware that gang members would congregate at cemeteries where fellow members were buried, and that a Rollin' 60's gang member, Patrick Kimmons, was buried at Lone Fir Cemetery. *See* ECF 21-4, Def. Ex. 4, at 5; ECF 21-5, Def. Ex. 5, at 2; Sept. 28, 2021 Tr. at 15–16, 102. Additionally, gang members were known to arm themselves during large gatherings, as they were vulnerable to attacks by rival gangs. Sept. 28, 2021 Tr. at 19, 102, 147.

Officer Espana and Officer Madison—who has been with the PPB since 2012—arrived on the scene at approximately 7:00pm in an unmarked Ford Explorer and remained out of sight of the attendees. ECF 24 at 2–3; Sept. 28, 2021 Tr. at 12, 14, 100–01. At approximately 8:24pm, officers in marked cars arrived at the cemetery, within view of the attendees. ECF 21-4, Def. Ex. 4, at 6; ECF 21-5, Def. Ex. 5, at 2. Officers Espana and Madison noticed Defendant "quickly turn away from the group and police and move toward a black sedan." ECF 24 at 4; Sept. 28, 2021 Tr. at 20–21, 105. Based on their training and experience, they found this type of behavior

suspicious and common among people who have an outstanding warrant or who are carrying contraband or a weapon. ECF 21-4, Def. Ex. 4, at 6; Sept. 28, 2021 Tr. at 105.

Defendant proceeded to leave the cemetery. He quickly backed out of his parking spot, sped down the cemetery roads, and did not turn on his headlights. ECF 21-4, Def. Ex. 4, at 6; Sept. 28, 2021 Tr. at 106. Officers Espana and Madison observed Defendant Moore's car nearly colliding with their car and a tree and swerving off the road. Sept. 28, 2021 Tr. at 22, 106. Further, upon exiting the cemetery onto Southeast 26th Avenue, they observed that Defendant failed to yield to another car and nearly collided with that car. Sept. 28, 2021 Tr. at 24, 107. The officers believed Moore was driving recklessly, a criminal and arrestable offense pursuant to O.R.S. 811.140. ECF 21-5, Def. Ex. 5, at 3; Sept. 28, 2021 Tr. at 23, 107; *see also* O.R.S. 811.140 (explaining reckless driving is driving "in a manner that endangers the safety of persons or property" and punishable as a Class A misdemeanor). The officers also noted that Defendant's failure to yield at the intersection of Southeast 26th Avenue was a traffic violation. Sept. 28, 2021 Tr. at 23, 106–07.

At approximately 8:27pm, Officers Espana and Madison pulled Defendant over on Southeast Stark Street. ECF 24 at 5; Sept. 28, 2021 Tr. at 23–24, 27, 107. Defendant stopped the car over a foot from the curb, partially in the lane of traffic. ECF 21-5, Def. Ex. 5, at 3; ECF 24-1, Gov. Ex. 1. Officer Madison approached the driver's side of the car and Espana approached the passenger side. ECF 21-5, Def. Ex. 5, at 3; ECF 21-4, Def. Ex. 4, at 6; Sept. 28, 2021 Tr. at 28, 108. The officers recognized Defendant as a known associate of the Rollin' 60's gang who was on federal supervised release related to a conviction for Felon in Possession of a Firearm. ECF 21-4, Def. Ex. 4, at 6. The officers also observed that Defendant was wearing black pants

and a white t-shirt, and a black sweatshirt[3] was on the front passenger-side floorboard, which

they believed was consistent with the description provided by the 911 caller of the person who

picked up a firearm at the cemetery gathering. *Id*.; ECF 21-5, Def. Ex. 5, at 3; Sept. 28, 2021 Tr.

at 28–29, 108–09.

       Officer Madison asked for Defendant's license, registration, and proof of insurance. ECF

21-5, Def. Ex. 5, at 3. Defendant provided his Oregon driver's license and temporary

registration, but explained that the car was a rental and he did not have proof of insurance. *Id*.

Defendant was unable to produce a written rental agreement. *Id*. Officer Madison returned to the

police car with Defendant's license and registration to conduct a records investigation. *Id*.; Sept.

28, 2021 Tr. at 31–35. At approximately 8:31pm, Officer Madison requested information

regarding Defendant from law enforcement databases. ECF 24 at 6; Sept. 28, 2021 Tr. at 31–35.

Officer Madison's records investigation entailed running Defendant's license, sorting out why

the records check showed Defendant had a valid Oregon license but an expired Washington

license, confirming the vehicle's registration, checking whether Defendant was subject to any

warrants or open investigations, and checking Defendant's state or federal supervised release

status. Sept. 28, 2021 Tr. at 31–35, 93. Officer Madison estimates the records check took

approximately five minutes. *Id*. at 34–35. At this time, Defendant called his mother and told her

to come to the scene. ECF 21-7, Moore Decl., at ¶ 4.[4]

---

[3] This clothing item is referred to in the police reports as a sweatshirt, hoodie, or jacket.
*See, e.g.*, ECF 21-4, Def. Ex. 4, at 6 ("I could see a clean, black athletic sweatshirt or hoody[.]");
ECF 21-5, Def. Ex. 5, at 3 ("Moore was wearing black pants and there was a black jacket on the
front passenger floorboard."). The Court finds that any discrepancy as to the exact type of
clothing item does not affect the Fourth Amendment analysis in this case.

[4] The Court notes that while the declaration submitted states that Defendant "does swear
under the penalty of perjury" to the truth of the declaration's contents, the declaration itself is
signed only by defense counsel, Mr. Schindler. While the Court considers the declaration, the
Court notes it is lacking this indicium of truthfulness, which goes to weight. Defendant did not

While Officer Madison was conducting the records investigation, Officer Espana approached the driver's side of the car.[5] Sept. 28, 2021 Tr. at 109. Officer Espana observed Defendant leaning forward toward the steering wheel in a way that blocked his view of the front passenger area, which seemed suspicious to the officer. ECF 21-4, Def. Ex. 4, at 7; Sept. 28, 2021 Tr. at 100. Defendant was then able to produce the car rental agreement on his cell phone. Sept. 28, 2021 Tr. at 111. Officer Espana noted that the rental term had expired that morning; Defendant stated he had extended the rental but was unable to produce proof of any extension. *Id.*

Officer Espana noticed "a strong odor of an alcoholic beverage" on Defendant's breath and "slurred" speech. *Id.* Officer Espana claims that Defendant admitted to drinking alcohol at the gathering. ECF 21-4, Def. Ex. 4, at 7.[6] Upon Officer Madison's return to the car, Officer Espana told Officer Madison that Defendant had admitted to drinking and they decided to pursue a DUII investigation. ECF 21-5, Def. Ex. 5, at 4.

Defendant agreed to be evaluated by a traffic officer. ECF 21-4, Def. Ex. 4, at 7. Officer Madison contacted a traffic officer. ECF 21-4, Def. Ex. 4, at 7; Sept. 28, 2021 Tr. at 38. At 8:41pm, Officer Gaither arrived to conduct field sobriety tests. ECF 24 at 7–8. Officer Gaither had been part of the PPB Traffic Division since 2010. Transcript of Motion Hearing at 8–9, *United States v. Moore*, No. 3:20-cr-00474-IM-1 (D. Or. Oct. 15, 2021) [hereinafter "Oct. 15, 2021 Tr."]. Defendant was removed from the car and searched for weapons by Officer Espana;

---

testify at the hearing on Defendant's Motion to Suppress and therefore was not subject to cross-examination.

[5] Defendant does not recall speaking with Officer Espana. ECF 21-7, Moore Decl., at ¶ 5.

[6] Defendant denies having any conversation regarding being intoxicated with the officers. He states he "never admitted to drinking earlier that day." ECF 21-7, Moore Decl., at ¶ 5.

no weapons were found on his person. ECF 21-4, Def. Ex. 4, at 7. While Officer Gaither was

performing the sobriety tests, Defendant commented that he was cold, but when Officer Gaither

asked if he wanted to wear the black sweatshirt in the car, Defendant said no, which suggested to

the officers that Defendant was attempting to conceal something under the sweatshirt. *Id*.; Sept.

28, 2021 Tr. at 114–15 (explaining such conduct was suspicious and indicated to Officer Espana

that "it potentially meant he was concealing an item on the floorboard").

    At 8:53pm, Officer Gaither informed Officer Espana that "horizontal gaze nystagmus

was observed, but that it was not sustained," which indicated to Officer Gaither that while

Defendant showed some signs of impairment, they were not sufficient to establish probable

cause for DUII. ECF 24 at 8; Oct. 15, 2021 Tr. at 15, 20–21. This could result either from not

being intoxicated, or from recent consumption of alcohol that the body is only beginning to

process. ECF 24 at 8; ECF 21-4, Def. Ex. 4, at 8. Officers Espana and Madison informed

Defendant that they were concerned about signs of intoxication and his lack of insurance, and

that they were not going to allow him to drive away from the scene because there was probable

cause to arrest him for reckless driving. ECF 21-4, Def. Ex. 4, at 8; ECF 21-5, Def. Ex. 5, at 4;

Sept. 28, 2021 Tr. at 41–42, 116–17 (explaining that "based off the totality of the circumstances,

[the officers] wouldn't have let him go").

    Meanwhile, Sergeant DeFrain, who had responded to the cemetery, was approached by a

woman while in an unmarked police car. ECF 21-6, Def. Ex. 6, at 2; Sept. 28, 2021 Tr. at 152.

That woman told Sergeant DeFrain that while she was at a pizza restaurant, located near Officer

Espana and Madison's traffic stop, she overheard two people—"[a] black female with piercings

in both cheeks and a black male wearing black clothing"—talking on the phone with someone

being stopped by the police. ECF 21-6, Def. Ex. 6, at 2; ECF 24 at 9. She heard them ask

whether the person being stopped was going to "hurt" or "shoot" the police. ECF 21-6, Def. Ex. 6, at 2; ECF 24 at 9; *see also* Sept. 28, 2021 Tr. at 152 (recalling woman overhearing "a black female with, I think she said piercings in both cheeks, and a male" ask about "hurt[ing]" or "shoot[ing]"). Finding this information credible and concerning, and understanding the phone call to be referring to the stop of Defendant, Sergeant DeFrain immediately departed to convey this information to Officers Espana and Madison; he arrived at the scene at 8:48pm. ECF 21-6, Def. Ex. 6, at 2; ECF 24 at 8–9. Sergeant DeFrain arrived as Officer Gaither was leaving. Sept. 28, 2021 Tr. at 116, 153. Segreant DeFrain informed Defendant that the car would be towed and searched. ECF 21-6, Def. Ex. 6, at 3; ECF 21-5, Def. Ex. 5, at 4; Sept. 28, 2021 Tr. at 43, 117–18, 153–54.[7]

Defendant "began getting more upset," and Sergeant DeFrain told him to step back from the car. ECF 21-6, Def. Ex. 6, at 3; Sept. 28, 2021 Tr. at 155 (explaining that Defendant "continued to want to walk up and kind of stop us" and was "three to four feet from the [passenger side] door"). Defendant did not stand back, and he was arrested at 9:01pm for interfering with a peace officer. *Id.*; ECF 24 at 9. The time between the initial traffic stop and his arrest was approximately 34 minutes. Based on the testimony of Ms. Brown, Defendant's cousin, she, along with Defendant's mother, arrived at the scene after Defendant has been arrested and placed in a police car. Oct. 15, 2021 Tr. at 31, 38–39. Though Ms. Brown had intended to take possession of Defendant's vehicle and drive it to a location where it would no longer be

---

[7] Defendant asserts that at this point, the officers "demanded to search [his] car," that he "continued to refuse consent," and that the officers "were threatening to take [him] to jail unless [he] consented." ECF 21-7, Moore Decl., at ¶ 9. First, no such evidence was presented at either hearing in support of the Motion to Suppress. Second, as indicated above, the declaration is signed by defense counsel, rather than by Defendant, and Defendant was not subject to cross-examination. *See id.* at 5.

considered a hazard, by the time she arrived, she was unable to speak with either Officer Madison or Espana. *See id.* at 39; *see also* Sept. 28, 2021 Tr. at 43. The officers had already requested a tow, begun the search, and placed the Defendant in a police car, by the time she arrived. Ms. Brown did not have the opportunity to speak to police about moving the car, but she and Defendant's mother who accompanied her to the scene, were able to take some of Defendant's possessions from him, such as his jewelry. Oct. 15, 2021 Tr. at 35, 39. Officers Madison and Espana testified that they did not see anyone on the scene who could take possession of the car when they decided to tow the car. Sept. 28, 2021 Tr. at 42, 117.

At 9:04pm, Officer Madison requested a tow service and began to search the car. ECF 24 at 9. Officer Madison almost immediately found a loaded silver and black semiautomatic handgun underneath the black jacket on the front passenger seat floorboard. ECF 21-5, Def. Ex. 5, at 4; Sept. 28, 2021 Tr. at 45–46, 155 (noting recovery of firearm within "seconds" of beginning search).

As Officer Madison was processing the weapon, Officer Espana advised Defendant of his *Miranda* rights and Defendant indicated he understood them. ECF 21-4, Def. Ex. 4, at 8. Defendant denied knowing about the gun and the sweatshirt. *Id.* Office Espana requested consent for a DNA swab of Defendant. *Id.* After being asked a second time, Defendant replied, "yeah that's fine." *Id.*

On October 6, 2020, a federal grand jury returned an indictment charging Defendant with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). ECF 1.

## STANDARDS

The Fourth Amendment protects against unreasonable searches and seizures by the government. U.S. Const. amend. IV; *Elkins v. United States*, 364 U.S. 206, 213 (1960) (applying Fourth Amendment to searches and seizures by state law enforcement offices through the

Fourteenth Amendment). Searches conducted without a warrant are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted); *see also Riley v. California*, 573 U.S. 373, 382 (2014) ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."). "The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012). The ordinary remedy for an unreasonable search is the exclusionary rule, which prohibits "evidence seized during an unlawful search" from use at trial. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

## DISCUSSION

### A. Traffic Stop

Though Defendant contends that the PPB did not have probable cause to stop him, the Court finds on the record presented that the stop did not violate Defendant's Fourth Amendment rights. *See* ECF 21 at 57. The officers had not only the requisite reasonable suspicion to conduct a traffic stop, but also probable cause to believe Defendant committed a traffic violation.

The temporary detention of a person during a traffic stop by police is a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). The stop must not be "unreasonable under the circumstances." *Id.* (internal quotation marks omitted). A traffic stop is permissible if officers have "reasonable suspicion to conclude that a traffic violation occurred." *United States v. Willis*, 431 F.3d 709, 714–15 (9th Cir. 2005); *see also United States v. Lopez-Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000) (reaffirming that the "Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops"); *Whren*, 517 U.S. at 810 (finding "the decision to stop an automobile is reasonable where

the police have probable cause to believe that a traffic violation has occurred"). Reasonable suspicion consists of "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir. 1992), *opinion amended on denial of reh'g*, 997 F.2d 1306 (9th Cir. 1993) (internal quotation marks omitted) (quoting *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989)). Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *see also United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006) (defining probable cause as "when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place'" (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983))).

The record contains ample evidence that the officers had "reasonable suspicion to conclude that a traffic violation occurred." *Willis*, 431 F.3d at 715. Officers Espana and Madison observed Defendant speeding on the cemetery roads, failing to turn on his headlights, and nearly colliding with an unmarked police car and tree. ECF 24 at 11–12; Sept. 28, 2021 Tr. at 22, 106; *see also* O.R.S. 811.140 (reckless driving). Moreover, they observed Defendant nearly collide with and fail to yield to a car as Defendant entered the main road. ECF 24 at 12; Sept. 28, 2021 Tr. at 22–23, 106–07; *see also* O.R.S. 811.280 (failure to yield right of way). These observations are sufficient to form a reasonable suspicion that Defendant violated traffic laws and justify a traffic stop. Moreover, under *Whren*, the officers' direct observations establish not only reasonable suspicion, but also probable cause to believe Defendant committed a traffic violation. *See Whren*, 517 U.S. at 808 (finding probable cause to believe defendant committed a civil

traffic violation where Defendant was in a "high drug area," and upon seeing the police car, made a sudden turn and sped away). The traffic stop was lawful.

Defendant raises the contention that the stop was pretextual. *See* ECF 21 at 58–60.[8] The Supreme Court's decision in *Whren*, however, "stands for the proposition that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose." *Willis*, 431 F.3d at 715; *see also United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000), *as amended* (July 7, 2000) ("The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop."); *Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). The Government has established that "the objective circumstances justif[ied] the stop," *Wallace*, 213 F.3d at 1219, and that officers had probable cause to believe a traffic violation occurred; therefore, whether the stop was pretextual is of no import in this analysis.[9]

Further, Defendant argues that any probable cause is undermined "by the fact that other than initiate a traffic stop, the officers did nothing consistent with the reported belief that [Defendant] had just committed an arrestable traffic offense," and that Defendant "is never cited

---

[8] More specifically, Defendant explains that in 2018, an audit found that "the PPB Gang Team used 'traffic violations as a pretext to create opportunities to search for illegal guns or to arrest people for other crimes,'" ECF 21 at 58 (footnote omitted), and that in the instant case, the officers "were investigating much more than a traffic stop and this was just a pretext to target a Black man," *id*. at 60; *see also* ECF 21-3, Def. Ex. 3, at 2 (noting Sergeant DeFrain stated "[i]t's a gan[g]ster party" and "we'd like to catch somebody dropping something or doing something taking off on us").

[9] To the extent Defendant is making a claim of selective enforcement of the law based on race, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Whren*, 517 U.S. at 813.

for reckless, careless driving, or any traffic offense." ECF 21 at 58–59. However, Supreme Court and Ninth Circuit precedent require that "officers have reasonable suspicion to stop a driver for traffic infractions, not that the officers issue citations." *Willis*, 431 F.3d at 717. As stated, the stop was justified by reasonable suspicion of a traffic violation; that the officers did not then arrest or cite Defendant for the traffic violation does not render the stop unlawful.[10]

## B.  DUII Investigation

Following the initial traffic stop, the officer conducted a DUII investigation. The Court finds that based on the circumstances presented during the stop, the officers developed reasonable suspicion of the independent offense, which justified extending the traffic stop in order to conduct the DUII investigation.

The Supreme Court has held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop [but] he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 355. The Supreme Court explained such checks include "ordinary inquiries incident to [the traffic] stop." *Id*. (internal quotation marks omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)).  These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. As the Ninth Circuit has explained, "*Rodriguez* requires that a traffic stop may be extended to conduct an investigation into matters other than the original

---

[10] Though Defense Exhibit 4 does not list "reckless driving" under "charges," during his testimony, Officer Madison stated that Officer DeFrain arrested Defendant for interfering with an officer and for reckless driving. Sept. 28, 2021 Tr. at 44.

traffic violation only if the officers have reasonable suspicion of an independent offense." *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019).

The record indicates that the officers developed reasonable suspicion that Defendant had been drinking while they were conducting the initial traffic stop. While Officer Madison was still conducting a records investigation and while Officer Espana was speaking to Defendant regarding rental car and insurance matters, Officer Espana developed reasonable suspicion that Defendant was under the influence of alcohol. *See* ECF 24 a 6–7 (noting he smelled alcohol and Defendant's speech was slurred); Sept. 28, 2021 Tr. at 111. Prior to Officer Madison's return from conducting the records investigation, Officer Espana asked Defendant if he had been drinking, and Defendant purportedly "told [him] that he had a few drinks back at the cemetery."[11] ECF 21-4, Def. Ex. 4, at 7; Sept. 28, 2021 Tr. at 112 (explaining Defendant told Espana he consumed alcohol). These circumstances—the smell of alcohol, the slurred speech, the admission of drinking, coupled with the reckless driving—establish "reasonable suspicion of an independent offense"—namely driving under the influence of intoxicants in violation of O.R.S. 813.010—which justified extending the traffic stop to conduct a DUII investigation. *See Landeros*, 913 F.3d at 867; *United States v. Moore*, No. 3:16-cr-00171-JO, 2016 WL 7422650, at *3 (D. Or. Dec. 21, 2016), *aff'd*, 726 F. App'x 620 (9th Cir. 2018) ("[A]n officer may make unrelated inquiries during a lawful traffic stop, so long as they do not measurably increase the duration of the stop.").

## C.  Warrantless Search

For the reasons set forth below, the search of Defendant's vehicle did not violate his Fourth Amendment rights. Moreover, the stop was not unreasonably prolonged following the

---

[11] Defendant contests that he made this admission. *See* ECF 21-7, Moore Decl., at ¶ 5.

completion of the DUII investigation. While Officer Gaither was conducting the DUII

investigation, Sergeant DeFrain received the information regarding the overheard phone call that

suggested Defendant might have a firearm, and Sergeant DeFrain arrived on the scene to convey

this information just as Officer Gaither had completed his DUII investigation and was departing.

Sept. 28, 2021 Tr. at 116, 152–53.

### 1.    Automobile Exception

Evaluating the totality of the circumstances and the officers' collective knowledge, this

Court finds that the officers had probable cause to believe the vehicle contained evidence of a

crime—that Defendant, having previously committed a felony, was in possession of a firearm.

"Under the automobile exception to the warrant requirement, police may conduct a

warrantless search of a vehicle if there is probable cause to believe that the vehicle contains

evidence of a crime." *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010). "[A] police

officer may draw inferences based on his own experience in deciding whether probable cause

exists." *Ornelas*, 517 U.S. at 700.

Defendant argues that there was no probable cause because "[t]he only suggestion of any

kind of firearm was the white man's lie describing a Black man among 40 Black men who did

not match [Defendant] at all, possibly picking up a shotgun, or maybe not." ECF 21 at 65; *see

also* ECF 26 at 5. This Court must consider "the collective knowledge of all the officers

involved," ECF 24 at 16–17 (quoting *United States v. Ramirez*, 473 F.3d 1026, 1032–37 (9th Cir.

2007) (internal quotation marks omitted)), as well as the rationales supporting the reasonable

belief Defendant was armed and dangerous, *id*. at 17. On the facts presented, the officers knew

the following information. Defendant was a known associate of the Rollin' 60's gang on federal

supervised release related to a conviction for Felon in Possession of a Firearm. He was attending

an event at which it was common for attendees, known gang members or associates, to be armed,

PAGE 16 – OPINION AND ORDER

and the Rollin' 60's gang had held similar events in prior years. At these prior events, firearms

had been recovered or shootings had occurred. The PPB's goal in monitoring and eventually

breaking up the gathering was to prevent a shooting. Upon seeing police at the cemetery,

Defendant engaged in behavior common among those who have an outstanding warrant or who

are carrying weapons: he attempted to rapidly leave the scene. To do so, he drove recklessly and

rapidly through the cemetery, clearly trying to avoid contact with law enforcement. Upon being

stopped by the officers, the officers noticed that Defendant's clothing matched the second

description provided by the 911 caller—though the caller walked back on the menacing, he never

walked back on the existence of a firearm—and that Defendant engaged in evasive behavior

including attempting to block Officer Espana's view of the front passenger area and refusing the

officer's offer to get Defendant's sweatshirt, which was located in the front passenger area,

despite being cold.[12] Finally, the officers were aware of the tip from the woman who informed

Sergeant DeFrain that an individual being stopped by police nearby had discussed hurting or

shooting officers, suggesting that the person being stopped had a firearm. ECF 24 at 8–9; Sept.

28, 2021 Tr. at 44, 152–53 (answering "yes" by Officer Madison in response to the question

"[d]id you believe you had probable cause for a firearm being in that car"). These facts and

circumstances and reasonable inferences drawn therefrom indicate that there was a "fair

---

[12] The Court notes that the officers' testimony described Defendant as appearing extremely nervous. *See, e.g.*, Sept. 28, 2021 Tr. at 30–31, 37, 109, 112, 153–54. Though the Court finds the officers credible, the Court also notes that nervousness when interacting with police officers may be caused by numerous factors, including innocent ones, and therefore it carries little weight in the analysis. *See United States v. Cornejo*, 196 F. Supp. 3d 1137, 1154 (E.D. Cal. 2016).

probability" that Defendant's car contained a firearm.[13] Therefore, the warrantless search was justified under the automobile exception.

### 2. Inevitable Discovery and Inventory Search

Next, the Government argues, and this Court agrees, that even if the search was not supported by probable cause, discovery of the evidence in the vehicle, including the firearm, was inevitable because it would have been discovered during an inventory search pursuant to PPB policies in conjunction with the impoundment of the vehicle. *See* ECF 24 at 17–18.

"The inevitable discovery doctrine acts as an exception to the exclusionary rule and permits the admission of otherwise excluded evidence 'if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police.'" *United States v. Bonner*, 393 F. Supp. 3d 1063, 1067 (D. Or. 2019) (quoting *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000)). "In some circumstances, the inevitable discovery doctrine may apply because evidence 'would have been discovered through a lawful inventory procedure.'" *Id.* (quoting *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986)).

"Police may impound and search a motor vehicle without a warrant, so long as they do so in conformance with standardized procedures of local police department and in furtherance of a community caretaking purpose, such as promoting public safety or the efficient flow of traffic." *United States v. Maffei*, 417 F. Supp. 3d 1212, 1228 (N.D. Cal. 2019), *aff'd,* 827 F. App'x 760 (9th Cir. 2020) (citing *United States v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018)); *see also United States v. Caseres,* 533 F.3d 1064, 1074 (9th Cir. 2008) ("[W]arrantless inventory searches

---

[13] Moreover, based on the officers' observations, the officers had probable cause to believe Defendant was violating the terms of his supervised release. *See* Sept. 28, 2021 Tr. at 36.

of vehicles are lawful only if conducted pursuant to standard police procedures that are aimed at protecting the owner's property and at protecting the police from the owner charging them with having stolen, lost, or damaged his property."). "Once a vehicle has been legally impounded, the police may conduct an inventory search without a warrant." *United States v. Torres*, 828 F.3d 1113, 1120 (9th Cir. 2016); *see also Johnson*, 889 F.3d at 1127 (explaining that the Ninth Circuit has "held that PPB's inventory-search policies are valid for Fourth Amendment purposes, and that evidence found or seized in compliance with them may be admitted against a criminal defendant"). "The violation of a traffic regulation justifies impoundment of a vehicle if the driver is unable to remove the vehicle from a public location without continuing its illegal operation." *Miranda v. City of Cornelius*, 429 F.3d 858, 865 (9th Cir. 2005).

The Government argues that the vehicle inevitably would have been impounded and searched as a hazard, pursuant to PPB Directive 0630.60.4.3.2. *See* ECF 24 at 18 ("The vehicle's parked location created a clear hazard to other vehicles on the road, notwithstanding the hazard to property damage of the vehicle itself and the rental company."). The PPB Directive provides that that a vehicle may be impounded when it presents a community caretaking issue, such as if the vehicle "is impeding, or likely to impede, the normal flow of vehicular or pedestrian traffic." Moreover, the Portland City Code similarly provides that a vehicle can be towed when it is "parked . . . in a manner that may be hazardous to traffic." Portland City Code § 16.30.210; *see also id*. at § 16.90.385 (defining traffic hazard as "[a]ny object, including vehicles that impede the safe movement of vehicles in the public right-of-way").

The Government has provided sufficient evidence to demonstrate that the car was a hazard as parked. *See* ECF 24-1, Gov. Ex. 1, at 1–3. Defendant's vehicle was stopped in the lane of traffic and was impeding the flow of traffic, and due to Defendant's lack of insurance coupled

with the reckless driving, the officers were not intending to allow Defendant to move the vehicle. Sept. 28, 2021 Tr. at 28, 41–42, 107, 117, 135–36.

Defendant, citing PPB policy, argues that others were present who could have moved Defendant's vehicle, such that the officers would not have been permitted to impound and search the vehicle. ECF 21 at 38–39, 50. Though the policy directive provides that officer should not impound a vehicle if "a lawful driver . . . is present at the scene," the directive also explains that officers "may wait for such a person to arrive, but are not required to if such person is not present at the time the officer requests tow service." PPB Directive 0630.60.4.2.3.[14] Defendant contends that his mother and cousin were present and therefore should have been permitted to move the vehicle. ECF 21 at 38–39, 50.  Officer Espana testified, on the other hand, that he did not recall anyone telling him they could take the car. Sept. 28, 2021 Tr. at 117. Similarly, Officer Madison testified that he only "found out later" that, after the arrest, Defendant's mother arrived, and that neither Defendant nor his mother "ever indicate[d] a desire that she drive the car away." *Id.* at 42. Ms. Brown's testimony corroborates this. Ms. Brown testified that she, along with Defendant's mother, did not speak with PPB officers about driving the car, and that Defendant had already been arrested and was in a police car when they arrived. Oct. 15, 2021 Tr. at 31, 38–39. Additionally, by the time they arrived, Officer Madison had already requested the tow

---

[14] Aside from the PPB policy, courts within this Circuit have explained that "[a]n officer, acting within the scope of his or her community care-taking function, is not required to consider 'the existence of alternative less intrusive means' when the vehicle must in fact be moved to avoid the creation of a hazard or the continued unlawful operation of the vehicle." *City of Cornelius*, 429 F.3d at 865 n.6 (quoting *Colorado v. Bertine*, 479 U.S. 367, 374 (1987)); *see also Crockett v. City of Gresham*, No. 3:18-CV-00800-HZ, 2019 WL 2011045, at *9 (D. Or. May 3, 2019) ("To justify impoundment, however, officers 'ha[ve] no Fourth Amendment obligation to offer the driver an opportunity to avoid impoundment,' or 'make other arrangements for the safekeeping of his property.'" (first quoting *United States v. Penn*, 233 F.3d 1111, 1116 (9th Cir. 2000), then quoting *Bertine*, 479 U.S. at 373)).

service and discovered the firearm. Officer Madison called the tow service at 9:04pm, only three minutes after Defendant was arrested, he found the firearm mere "seconds" after beginning the search, and following the discovery, Officer Madison then directed that Defendant be taken to the police car. *See* ECF 24 at 9; Sept. 28, 2021 Tr. at 45–46; Oct. 15, 2021 Tr. at 31, 38–39 (noting the tow truck arrived while Ms. Brown was at the scene and Defendant was already in a police car when she arrived). Moreover, Defendant provided no proof to the officers that he was validly in possession of the rental car, or that others were authorized to drive the rental car. *See* Sept. 28, 2021 Tr. at 35, 117.

The weight of the evidence indicates that the officers, acting in accordance with PPB policy, would have been permitted to impound Defendant's vehicle as a hazard and conduct a warrantless inventory search of the vehicle. The discovery of the firearm, located under Defendant's sweatshirt on the passenger side floorboard, was inevitable.

### 3. Protective Search for Weapons[15]

Citing *Michigan v. Long*, 463 U.S. 1032 (1983), the Government appears to argue that the search was a proper protective search based on reasonable suspicion that the Defendant had a firearm in his car—that Defendant was dangerous and may gain immediate control of the weapon. ECF 24 at 15. In response, Defendant does not directly argue the applicability of this exception, but notes that:

> Mr. Moore had been removed from his car and frisked by officers
> long before the tip. Therefore, long before the tip, the officers

---

[15] The Government appears to argue, in passing and without citing authority, that Defendant's vehicle "was subject to search incident to arrest." ECF 24 at 17. Additionally, the Government very briefly argues, citing only *Herring v. United States*, 555 U.S. 135 (2009), that the officers "operated in good faith when they search[ed] the vehicle for a gun," rendering suppression inappropriate. *Id.* at 19. Because these exceptions were not adequately briefed nor pressed at oral argument, and because the suppression motion can be otherwise resolved, the Court declines to consider these exceptions to the warrant requirement.

> know that he is not armed and not a danger to anyone. Mr. Moore
> is dozens of feet from his car and surrounded by officers and
> unable to arm himself from the vehicle when Sgt. Defrain returns
> and orders him arrested. Because the tip came in after Mr. Moore
> was removed from his vehicle and frisked for field sobriety test,
> the timing makes the government's argument impossible. The
> cases cited by the government or inapposite.

ECF 26 at 5. Because this Court has found the vehicle search was supported by probable cause

and in the alternative that the firearm would have been inevitably discovered, the Court need not

determine whether the search falls under the warrant exception established in *Michigan v. Long*.

Without ruling, the Court will, however, briefly note the applicable legal standard and comment

on some of the factual and legal issues in the instant case.

"[T]he search of the passenger compartment of an automobile, limited to those areas in

which a weapon may be placed or hidden, is permissible if the police officer possesses a

reasonable belief based on 'specific and articulable facts which, taken together with the rational

inferences from those facts, reasonably warrant' the officers in believing that the suspect is

dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049

(quoting *Terry v. Ohio*, 329 U.S. 1, 21 (1968)). Valid protective searches do not require probable

cause. *United States v. Chargualaf*, 114 F.3d 1196 (9th Cir. 1997). Rather the inquiry is

"whether a reasonably prudent man in the circumstances would be warranted in the belief that

his safety or that of others was in danger." *Long*, 463 U.S. at 1051 (internal quotation marks

omitted) (quoting *Terry*, 329 U.S. at 27).

As stated above, there are sufficient facts in the record to meet the first prong of *Long*—a

reasonable belief of dangerousness. The closer call is whether the Government can meet the

second prong—a reasonable belief Defendant may gain immediate control of the firearm. At the

time of the search, Defendant was in handcuffs a few feet from the passenger side of the vehicle.

Sept. 28, 2021 Tr. at 155. The Government correctly points out by citing *Long* that protective

PAGE 22 – OPINION AND ORDER

searches of vehicles may be permitted even when a suspect is detained. ECF 24 at 16. The animating concerns are that a suspect "might . . . break away from police control and retrieve a weapon from his automobile" or that "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *See Long*, 463 U.S. at 1051–52; *see also Haynie v. County of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2003) (finding defendant was not arrested though handcuffed and *Long* search for weapons was not unconstitutional); *United States v. Vandergroen*, 817 F. App'x 420, 423 (9th Cir. 2020), *cert. denied,* 141 S. Ct. 1696 (2021) (finding defendant was not arrested and "[a]lthough [he] was handcuffed and in the back of a police car during the car search, he would have gained immediate access to this weapon if the police had released him after finding no open warrants and no weapon on his person"); *United States v. Wilson*, No. 3:15-CR-00080-JO-1, 2016 WL 2930707, at *2 (D. Or. May 18, 2016), *aff'd*, 716 F. App'x 667 (9th Cir. 2018) ("At the time of the search, both officers were concerned about officer safety and thought it was possible [the driver or defendant] could have made a break, gotten to the hood of the patrol car to get the bag.").

However, the Ninth Circuit and courts within the circuit have suggested that it is not fully resolved whether a protective search is valid if the defendant is already arrested. *See United States v. Perryman*, 716 F. App'x 594, 596 (9th Cir. 2017) (declining to "consider the intersection of *Long* and *Gant*" and finding no valid protective search where suspects were handcuffed and there was "no immediate risk that [they] would gain control of the weapons at the time the search was conducted"); *United States v. Brunick*, 374 F. App'x 714, 716 n.2 (9th Cir. 2010) (declining to apply *Long* where "both [defendant and driver] were arrested and handcuffed at the time of the search"); *United States v. Kulkarni*, No. 2:10-CR-00217 KJN, 2010

WL 5059704, at *10 n.13 (E.D. Cal. Dec. 3, 2010) (noting the court's "concern regarding whether [the officer's] conduct falls outside of the holding in *Long* because [the suspects] were handcuffed and located several feet away from the vehicle when [the officer] searched the vehicle"). *Cf. Arizona v. Gant*, 556 U.S. 332, 335 (2009) (holding the search incident to arrest exception does not apply "after the arrestee has been secured and cannot access the interior of the vehicle" to gain possession of a weapon or destroy evidence).

Without the benefit of developed testimony and argument on this exception, the Court cannot determine whether or not the holding of *Long* supports the search in this case. *See* Sept. 28, 2021 Tr. at 41–42, 116–17.

**D. Consent to DNA Swab**

Defendant claims that the DNA evidence should be suppressed because it was unlawfully collected. *See* ECF 21 at 65–67. Defendant argues, in a relatively conclusory fashion and without citing to specific evidence in the record, that "[a]ny purported consent from him was merely a submission to a claim of lawful authority" because he "had been placed under arrest," "was surrounded by GVRT officers," and "[h]is acquiescence was not freely and voluntarily given." *Id*. at 67. Defendant did not argue the issue of the DNA swab at either hearing and did not cross-examine the officers about it at the hearings. The Government elicited evidence at the hearing that Officer Espana requested consent for a DNA swab, but did not otherwise argue or examine witnesses as to the DNA swab. Sept. 28, 2021 Tr. at 120. The police reports demonstrate that Defendant initially did not provide a clear answer and instead asked, "Why? This already looks bad enough," and stated that "You guys already have my DNA on file." ECF 21-4, Def. Ex. 4, at 8. Upon asking a second time, Defendant consented. *Id*. (reporting that Defendant stated "yeah that's fine").

If the Government "seeks to rely upon consent to justify the lawfulness of the search," the Government must show that consent was "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *see also United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997). Factors tending to show a lack of voluntariness include: "(1) the person was in custody; (2) the officer had his weapon drawn; (3) the officer failed to administer *Miranda* warnings; (4) the officer did not inform the person of his right to refuse to consent; and (5) the person was told that a search warrant could be obtained." *Chan-Jimenez*, 125 F.3d at 1327. It is not necessary for a court to find all factors present, nor is one single factor dispositive. Rather, the factors are "guideposts." *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004).

In the instant case, though neither party developed this point at either hearing, the evidence in the record indicates that Defendant was advised of his *Miranda* rights and that he understood them, and the officers did not have their weapons drawn, though Defendant was in the presence of multiple officers. ECF 21-4, Def. Ex. 4, at 8; ECF 21 at 67; Sept. 28, 2021 Tr. at 30, 119–20. There is no indication that Defendant was told a search warrant could be obtained for his DNA. Defendant verbally agreed to the DNA swab. ECF 21-4, Def. Ex. 4, at 8. On balance, and in consideration of the fact that Defendant did not offer credible testimony to controvert the Government's evidence, the factors indicate that Defendant voluntarily consented to the DNA swab and there was no Fourth Amendment violation. Therefore, the DNA evidence should not be suppressed.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress, ECF 21, is DENIED.


**IT IS SO ORDERED**.

DATED this 4th day of November, 2021.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge